Judy Lynn CRAWFORD, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–92–00047–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 31, 1993.

**154**

Jan Woodward Fox, Cathleen C. Herasimchuk, Hardin, Beers, Hagstette & Davidson, Houston, for appellant.

David P. Weeks, Kay Douglas, Huntsville, for appellee.

Before OLIVER–PARROTT, C.J., and COHEN and EVANS *, JJ.

---

* The Honorable Frank G. Evans, retired Chief Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

## OPINION

FRANK G. EVANS, Justice (Assigned).

A jury convicted appellant of capital murder of her husband, William S. (Butch) Nichols, by employing two men, Louie John Brown and Thomas R. (T.R.) Oliver, to kill him. After the jury's guilty verdict, the trial court sentenced appellant to life imprisonment. We affirm.

On Monday, May 2, 1988, about 8:30 or 9:00 a.m., a gas company repairman found Butch Nichols' body lying on the floor of his home near Riverside, Texas. The cause of Nichols' death was a near-contact gunshot wound, the bullet having pierced Nichols' back, proceeding through his body and out his chest. It is undisputed that both John Brown and T.R. Oliver were at Nichols' home on Sunday night, May 1, 1988, and that one of the two men used the gun that killed him. In her brief, appellant suggests that the principal issue at trial and on this appeal is whether the evidence proves beyond a reasonable doubt that she was "the puppeteer who manipulated the strings" of her husband's killer.

### The Accomplice Testimony

The State's primary witnesses were Brown and Oliver. Because both men were charged with the murder of Nichols, both are accomplices as a matter of law. *See Villarreal v. State*, 576 S.W.2d 51, 56 (Tex.Crim.App. 1978), *cert. denied*, 444 U.S. 885, 100 S.Ct. 176, 62 L.Ed.2d 114 (1979). Both men admitted their participation in the murder and gave similar, but sometimes inconsistent, accounts of the sequence of events.

### Brown's Testimony

John Brown, who had pleaded guilty to solicitation of capital murder, was serving a 50–year sentence at the time of trial. He testified that he had met appellant through one of her co-workers, Norma Jean Smith, a nurse whom appellant supervised at the Ellis II unit of the Texas Department of Corrections. Brown met Norma Jean in December 1987 while repairing her trailer home in Palestine. He had fallen in love with her and moved into her trailer home with her.

In April 1988, Norma Jean, whom Brown characterized as "very manipulative," approached him about killing appellant's husband. She knew Brown had been in the penitentiary and believed Brown would know "how to do it" or would know someone who would. She told Brown that appellant wanted to have Nichols killed and that Nichols had beaten appellant. She said that Nichols occasionally came over to the Ellis' Bachelor Officer Quarters (BOQ), where she and appellant occasionally slept, and, on one occasion, had kicked in the door and threatened her, Norma Jean, with a gun. She said she was scared of Nichols.

About April 15, 1988, Norma Jean arranged a meeting between appellant and Brown, at which time appellant told Brown she wanted her husband killed. Brown thought appellant was joking, but he told her it would cost her $5,000. He told appellant he would not do it himself, but that he knew someone who would. He also told her it would not happen before any money was paid. Appellant said she would have the money in a few days. Later, Norma Jean gave Brown $2,000 in cash, wrapped in a bank wrapper. Brown said he considered this to be an advance payment for killing appellant's husband. Brown said he used half of the money for flower beds around Norma Jean's trailer house.

According to Brown, T.R. Oliver was a long-time alcoholic who was very slow-witted and would kill a person for $500. He said Oliver had been working with him at Norma Jean's house and had overheard him talking with Norma Jean about the killing of Nichols. He said Oliver later asked him if he was going to kill Nichols, and Brown replied that he was not. Oliver then offered to do the killing. Sometime in April, Oliver and Brown drove to Huntsville to drink beer and to allow Brown to see Norma Jean. When they arrived at the Ellis BOQ, Oliver stayed in the truck and Brown went inside, where he ran into appellant. Appellant asked Brown if her husband was going to be killed that night, and he replied in the negative. The two then walked outside, near where Oliver was sitting in the truck, but they did not speak with Oliver. However, according

to Brown, he and Norma Jean had identified Oliver to appellant as the person who would kill her husband. Brown also testified that he had paid Oliver $200 in cash.

On Sunday morning, the day of the murder, Brown and Oliver started drinking early and kept drinking all day. That evening, shortly before 10:00 p.m., Brown met appellant at the BOQ, and appellant asked him if this was the night her husband would be killed. Brown said he told her that "we were down there to do it." Brown and Oliver then left and drove from Palestine to Riverside, taking with them a .357 rifle and a .38 pistol, which Brown had borrowed from his brother in Tyler. After buying a half-case of beer at the "Texas T," a grocery store in Riverside, the two men drove to Nichols' home, arriving there about 10:25 p.m. Brown loaded the .38 pistol and left it on the front seat of the truck. Nichols came out of his house, and all three men went inside. Later, Oliver went out to the truck, followed by the other two men. At the truck, Oliver got another beer, picked up the pistol from the front seat, and put it in his pants' pocket. The three men then returned to the house, and Nichols went into the kitchen. At that point, Oliver walked up behind Nichols, pulled the pistol from his pocket, and shot him in the back. Nichols, mortally wounded, turned and said, "Oh man, why?" and then fell to the floor. Brown and Oliver then drove back to the Texas T, where Brown phoned appellant at the BOQ. He told her "it" was taken care of and she said "good and okay." Brown and Oliver drove to the Armadillo Club in Trinity, where they drank beer for several hours, and then drove to Norma Jean's house, where they drank more beer. Oliver left for awhile, but returning about 7:00 a.m., started to drink beer again. Soon thereafter, Norma Jean called and told Brown that appellant wanted to talk to him. When appellant came on the phone, she asked Brown to go back to Nichols' house because he was not dead. Brown refused, saying he needed to drive to Arp to borrow some money. Brown did go to Arp and returned about 10:30 to 11:00 a.m., when he received a second phone call from Norma Jean. She told him appellant said her husband was not dead and that he, Brown, should come back down. Brown and

Oliver then drove to a convenience store, where they met Norma Jean and appellant, and all four went to the Armadillo Club. Brown and Oliver stayed at the Armadillo Club, drinking beer, for about two hours while the two women went to Nichols' house to see if he was dead. When the two women never returned, Brown called the BOQ and learned appellant had been arrested and, after talking to police, had been released. Brown then met the two women and accompanied them while appellant drove to an attorney's office and to a funeral home. Brown and the two women returned to Norma Jean's trailer, where appellant called her father. Brown overheard appellant tell her father that Nichols had been murdered but that she did not know who did it. She also said she was going to be rich and could well afford anything she wanted. Brown said this was the first time he knew anything about the matter of insurance. Brown stayed drunk for several days and, during that time, took appellant to the home of her brother and went with her as she made funeral arrangements. Several days later, Brown returned the murder weapon to Tyler, stopping on the way to see his ex-wife Debbie Brown. He told his ex-wife that he had killed Nichols and she reported this conversation to Crime Stoppers. Brown was promptly arrested.

*Oliver's Testimony*

T.R. Oliver pleaded guilty to Nichols' murder and was serving a 75–year sentence at time of trial. Oliver was 58–years old, married, and had eight children. He had no prior convictions other than one for driving while intoxicated. Oliver said he and Brown had been "drinking buddies," and that he had helped Brown clean up Norma Jean's place in Palestine. The last night he and Brown went out drinking before the night of the murder, Brown told him about some lady named Crawford who wanted Brown to kill her husband. Brown asked him if he had ever killed anyone. When Oliver said he had not, Brown asked him if he would kill someone for $500. Oliver replied, "if I got drunk enough I might." Brown never told him why he wanted to kill "this man" and never told him how much money he, Brown, was going to get. Oliver denied that Brown ever paid

him anything. He said that if Brown had ever said anything about Oliver being paid $500, it must have been the night of the murder after he, Oliver, had been drinking heavily. On the day of the killing, Oliver and Brown started drinking around 9:00 a.m., and after riding around all day they went to the Armadillo Club and drank some more. When they got to Nichols' house, Brown loaded a pistol and put it on the seat, saying "Either (you) kill the so and so or I am." After the men went inside the house, Brown kept staring at Oliver, who got up and went back outside to the truck. Brown and Nichols followed him to the truck, and after he got a beer, all three returned to the house. As the men walked back inside the house, Brown turned and looked at him "real tough." Oliver then walked up "awful close" to Nichols and shot him once in the back. He said he was not clear about the incident because he had blacked out from drinking so much. He said Brown was the first person to tell him that he had shot Nichols. He later said he did not remember one way or the other whether he had shot Nichols and that he had sort of dreamed what happened. He said he remembered "walking up close to him, hearing a gun go off ... and when I went to the truck I had the gun so evidently I was the one that shot him." When asked why he agreed to kill Nichols, he said, "I don't know.... Crazy, I reckon, just crazy.... I wouldn't have done it probably if I hadn't been drinking. I wouldn't have done it for no kind of money." He said he was afraid of Brown and thought Brown might kill him if he did not go along with him.

*Point of Error No. One:*

In her first point of error, appellant claims the State failed to present sufficient independent evidence to corroborate the accomplice-witness testimony of Brown and Oliver.

■ Article 38.14 of the Code of Criminal Procedure provides:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

Tex.Code Crim.P.Ann. art. 38.14 (Vernon 1979). The corroborating evidence need not be sufficient to establish guilt nor even directly connect the accused to the crime, but it must be evidence which "tends to connect" the accused with the offense committed. *Cox v. State*, 830 S.W.2d 609, 611 (Tex.Crim.App. 1992).

■ In deciding whether there is sufficient corroborative evidence, we must eliminate the accomplice-witness testimony and determine whether there is evidence that *independently* tends to connect the accused to the crime. *Leal v. State*, 782 S.W.2d 844, 851 (Tex.Crim.App.1989). In making this determination, we may not consider the testimony of one accomplice witness as corroboration of the testimony of another accomplice, *Aston v. State*, 656 S.W.2d 453, 454 (Tex.Crim.App.1983), nor may we view the testimony of a third party about an accomplice's prior consistent statements as corroboration of the accomplice's testimony, *Reynolds v. State*, 489 S.W.2d 866, 872 (Tex.Crim. App.1972). Thus, we must eliminate from our consideration the testimony of the accomplice witnesses and also any prior out-of-court statements made by either of them to third parties.

*The Independent Evidence*

Troy Johnston, one of appellant's co-workers at the Ellis II Unit, testified that it was common knowledge that Nichols periodically beat appellant and that the appellant sometimes came to work with a black eye or "busted lips." He said Norma Jean Smith would talk with appellant about how "sorry" Nichols was and that the appellant would usually agree with her. Both women talked about how they would like to kill Nichols, and appellant said she would like to see him dead for the things he did to her. Norma Jean usually started these conversations asking appellant why she did not kill her husband. Johnston said, if the conversation got "too deep," appellant would change the subject and talk about horses or something else. He did not believe the women were serious and considered their talk to be just idle conversation. However, on the night of the murder, both women acted "real funny"; they seemed

nervous and would "hush" their conversations whenever someone else came around.

James McDonald, an insurance agent for Kentucky Life Insurance Company, testified that Nichols had purchased a $100,000 life insurance policy in the spring of 1985, which policy designated appellant as the sole beneficiary. Appellant paid all the premiums on the policy, which were increasing every year and had almost doubled since the policy had been purchased. He said that his company's record showed that someone claiming to be "Julius Crawford" had called on April 6, 1988, and asked the name of the beneficiary on the policy.

Marilee Henderson, a claim administrator for Blue Cross/Blue Shield, testified that appellant had applied for Texas Department of Corrections health and life insurance in 1986 and that appellant had health insurance coverage for herself and her husband, plus $2,000 basic term insurance, and $100,000 on her life. Appellant had also purchased a $50,000 life insurance policy naming her husband, Butch Nichols, as the primary beneficiary; however, in February 1987, she dropped her husband as beneficiary and named her father in his place. She also dropped her husband's health insurance coverage in September 1987 because of the increasing high cost.

Geraldine Bayless, an independent insurance agent, testified that in the early part of April 1988 she had received a telephone call from Nichols' insurance agent, indicating Nichols wanted to requalify his insurance to lower his premiums. She could not recall if she later talked to Nichols, but she did recall sending him an application for requalification on April 11, 1988. She said Nichols filled out the application, signed it, and sent it back.

Ruth Tullos, an independent insurance agent, testified that appellant came to her office with another woman about six months to a year before Nichols' death. Appellant said she wanted to buy term life insurance for both herself and her husband, saying she wanted $100,000 coverage on each. When Tullos learned that appellant and Nichols were not formally married, she told appellant that Nichols would have to come in for his policy. Nichols never came in.

Jean Watts, a former employee of Texas Department of Corrections, testified she had worked there as a personnel clerk from March until May 11, 1988, when she was discharged for facilitating the escape of two prisoners. She said that appellant called her in early to mid-March to ask about her insurance plan and that she and appellant went over the details of appellant's health and insurance program. She said appellant wanted to increase her insurance coverage and promised to come in the next morning, but did not do so until April 6, 1988.

On April 6, 1988, appellant increased her accidental death policy from $100,000 to the maximum coverage of $200,000, which automatically increased the amount of Nichols' insurance coverage to $100,000. Watts said she told appellant she would put April 6 as the effective date and that the insurance company would possibly approve that date. She explained, however, that the increase would become effective May 1, 1988, if not immediately effective. According to Watts, appellant said, "heaven forbid that anything should happen to her husband, but if something should happen she wanted to have the maximum coverage." Watts also testified that appellant twice asked her how long it would take to receive the money if she should ever have to file a claim. Watts stated that she had never been asked that question by any other customer purchasing a policy. On May 5, 1988, the day before Nichols' funeral, Watts received a telephone call from appellant, who told Watts that her husband had been murdered and asked about filing an insurance claim. She said appellant did not sound the least bit remorseful.

*The Appellant's Contentions*

Appellant asserts that the evidence is insufficient to corroborate the accomplice-witness testimony, because "taken singularly or collectively," it does not tend to connect her with the murder. She concedes that the evidence of increased insurance coverage may suggest a possible motive for murder, but she argues that this evidence does not corroborate the accomplice testimony because there are innocent, plausible reasons for the policy revisions. She refers to the

evidence showing that appellant was in charge of paying her husband's insurance premiums as well as her own; that his insurance costs were increasing all the time; that he had contacted his own insurance agent in early April to requalify for lower premiums; and that she was shopping for increased insurance coverage for both of them. She also points out that her dangerous work at the prison system justified her attempts to increase her own insurance coverage and explains that, if she could increase her husband's coverage at a lower rate, her husband's policy could be canceled, saving both of them money on insurance premiums. She argues that, because her husband's policy could not be canceled until after her policy became effective, it was important for her to know the date the new insurance coverage would become effective. She contends that the State's evidence lacks any probative value because the State failed to show that the increased insurance was "both out of the ordinary and acted as a motivating stimulus" to appellant herself. She asserts that her inquiries and actions were equally consistent with the innocent motives of a prudent consumer seeking increased insurance coverage at a lower cost, particularly when viewed with the evidence showing she qualified for hazardous duty pay at the time of the increase.

Concerning the evidence about her conversations with Norma Jean Smith, appellant argues that the evidence incriminates her only if it is shown that she adopted Norma Jean's statements as her own. Pointing to the testimony showing that Norma Jean initiated the conversations and that the witness who overheard the conversations did not take them seriously, she suggests that this evidence failed to show her motive for having her husband killed. She argues that the testimony about her nervousness on the eve of her husband's killing is so weak that it has no probative value.

*The Authorities*

In support of her contentions, appellant cites *Saunders v. State,* 817 S.W.2d 688 (Tex. Crim.App.1991), *Leal v. State,* 782 S.W.2d 844 (Tex.Crim.App.1989), and *Vails v. State,* 59 Tex.Crim. 340, 128 S.W. 1117 (App.1910).

We have examined each of these decisions and do not find them to be controlling under the facts of the instant case.

In *Vails,* the complainant of an attempted murder testified that he had hired the defendant to work on his farm, but had ordered him to leave after the defendant and the complainant's wife became amorous. *Vails,* 128 S.W. at 1119. Thereafter, the complainant's wife went to live with her daughter, Arline, and the defendant often visited her there. *Id.* Frequently, during such visits, Arline heard defendant say he did not like her father (the complainant) and that he wished he was dead. *Id.* Shortly before the shooting, the accomplice witness appeared at Arline's house, talked with the defendant, and then with Arline. *Id.* The accomplice told Arline that the defendant had promised him $250 to kill her father and that the money would come from her father's insurance money. *Id.* On the evening of the shooting, the accomplice told Arline and her mother that he would kill the complainant that night, and he went to get a rifle. *Id.* A few minutes later, a shot came through the window and hit the complainant as he read his newspaper. *Id.* The accomplice testified that the defendant had promised him $250 of the complainant's $2,000 life insurance policy for the killing and that he, the accomplice, had agreed to do it and had done it. *Id.* The Court of Criminal Appeals reversed the conviction, concluding that evidence of the defendant's motivation, standing alone, was not sufficient corroboration of the accomplice testimony and that there was no independent incriminating evidence to prove the defendant acted upon his animosity toward the complainant. *Id.* at 1120.

In *Leal,* a similar case, there was animosity between one of the defendants and the deceased victim over a family land squabble, which had culminated in a lawsuit between the defendant and the victim. *Leal,* 782 S.W.2d at 852. The Court of Criminal Appeals, citing *Reynolds v. State,* 489 S.W.2d 866 (Tex.Crim.App.1972), reversed the conviction, holding that evidence of motive, standing alone, was not considered sufficient corroboration of the testimony of the accomplice witness. *Id.*

In *Saunders*, the defendant was convicted of conspiracy to commit arson based on the testimony of an accomplice witness who said that the defendant had earlier asked him to set the fire, but later hired another person to do it. *Saunders*, 817 S.W.2d at 691. The witness also testified that he had agreed to safeguard some relatively inexpensive items of personal property for the defendant, which as a result, had not been destroyed in the fire. *Id.* To corroborate this testimony, the State offered proof that: (1) the burned structure had recently been insured for about $100,000 more than its replacement cost; and (2) that appellant was a successful horse breeder and trainer who typically borrowed large sums of money to finance his operations. Thus, the State sought to show that the defendant's profit motive for destroying his own home arose from personal and professional insolvency. *Id.* Other evidence, however, showed the actual fair market value of the property was greater than its replacement cost, and that the increased insurance coverage had, in fact, been recommended by the insurance carriers. *Id.* The Court of Criminal Appeals reversed the conviction and remanded the cause for a new trial, holding the circumstantial evidence was so weak that the trial court committed reversible error in failing to instruct the jury of the need to corroborate the accomplice-witness testimony. *Id.* at 693.

In each of these cases, there were factors that distinguish them from the instant case. In *Vails* and in *Leal*, the corroborating evidence consisted only of proof regarding the defendant's motivation for the crime. There was no other independent corroborating proof. In *Saunders*, the additional corroborating proof, the proof of increased insurance coverage, was rebutted by the proof showing the increase had been suggested by the insurance carrier. This rebuttal evidence presented a reasonable hypothesis other than guilt, and the jury could not disregard such an innocent explanation under the law in effect at that time.

■ In 1991, the Texas Court of Criminal Appeals overruled all prior opinions that required, in circumstantial evidence cases, the evidence exclude every reasonable hypothesis other than guilt. *Geesa v. State*, 820 S.W.2d 154, 161 (Tex.Crim.App.1991). Thus, the jury in the instant case was authorized "to choose between conflicting theories of the case." *See id.* at 159. As the reviewing court, we may not disturb the jury's prerogative to weigh all the evidence and to judge the credibility of the respective witnesses. *Id.*

We find greater difficulty in distinguishing the decision of the Court of Criminal Appeals in *Reynolds*, a murder case cited in the *Leal* decision. In that case, the body of the deceased had been found in a grassy area alongside a farm road southwest of Brackettville, Texas. *Reynolds*, 489 S.W.2d at 868. The deceased had been a sergeant in the Air Force and had been reported missing, along with his Chevrolet automobile, since November 26, 1969. The day he was reported missing, his car was found stuck in the mud under a bridge near Del Rio. *Id.* Based on the information received from the Air Force on December 10, 1969, a Texas Ranger visited the wife of the victim at a hospital where she was recovering from an attempted suicide. *Id.* at 868–69. The wife, who was later charged with the crime, consented to the search of her trailer home and automobile. *Id.* at 869. The officers recovered, among other items, a bone fragment and blood and hair specimens on the sheets, the walls, the ceiling, and the floor of the trailer. *Id.* They also found blood stains in the automobile matching the blood type of the victim. *Id.* An accomplice witness, the victim's stepdaughter, came forward on December 12, 1969, and accused her mother, the defendant, of murdering her stepfather. *Id.* The accomplice witness testified that she had been living with her mother and stepfather on November 25, 1969, when she returned home from a date about 10:30 p.m. and saw her stepfather asleep in the bedroom and her mother lying on a couch in the living room. *Id.* She said her mother told her she "had somebody flying in to get rid of J.R." (her stepfather) and that he, the killer, was scheduled to arrive in Del Rio at 2:00 a.m. *Id.* The witness was not surprised at these remarks because her mother had been making similar statements for about four years. *Id.* at 869–70. The witness said that when her

mother was "drinking real heavily," she talked about getting rid of her husband. *Id.* at 870. That evening her mother had been drinking heavily so the daughter half-way believed her and half-way did not. *Id.* About 2:30 a.m., on November 6, 1969, the witness was awakened by her stepfather's "coughing, gagging, and choking." *Id.* When she got out of bed, her mother told her to get back in her room. *Id.* A few minutes later, she again saw her mother, who appeared to be sober and "real scared." *Id.* Hearing the back door of the trailer house open, she looked out a window and saw her mother, dressed in an orange plaid coat (which belonged to the witness) and pajamas, with a man she could not recognize, place a blanket-covered body in the trunk of the family car. *Id.* The pair briefly returned to the trailer and then left together in the car. *Id.* After they left, the witness went to her stepfather's bedroom, where she found a trail of blood leading from the bed to the bathroom and a puddle of blood in the bathtub. *Id.* She could not find her stepfather on the premises, and she noticed the telephone in his room and the blanket on his bed were missing. *Id.* About 6:00 a.m., the witness was awakened by her mother's return. *Id.* She said her mother's pajamas were wet, and that her mother crawled in bed with her to try to sleep. *Id.* The witness asked her mother if she had drowned the victim and her mother replied she killed him with a hammer. *Id.* She also said "they had dumped on the side of the road" leading from Bracketville to Eagle Pass. *Id.* The witness' mother also told her daughter that she had killed her husband for the insurance money and that her companion was to get $10,000 for his part in the crime. *Id.* She said the car had been abandoned after it became bogged down while she was washing out the trunk. *Id.* She said she threw the blanket in the creek and the hammer and the telephone in the weeds nearby. *Id.* The mother and daughter then proceeded to clean the house, the mother spraying the bedside table with silver spray to cover blood stains and the witness scrubbing the bathroom to remove blood stains. *Id.* Later, on December 9, 1969, the witness took her coat to the cleaners, leaving it in her mother's name and instructing the cleaners to remove the blood stains. *Id.* The witness further testified that she had waited until December 12, 1969, to tell her story because she wanted to help her mother and she feared her mother's companion would return and kill her. *Id.* She admitted she had been given immunity to testify and said she was unaware at the time she accused her mother of the murder that she was designated as the secondary beneficiary of her stepfather's insurance policy. *Id.*

Another state witness, who operated Fisherman's Lounge in Del Rio, said the defendant had occasionally worked for her before November 25, 1969. *Id.* at 871. She recalled one night during the summer of 1969, when the defendant had been drunk in the bar and had made a remark that she was going to get rid of her husband. *Id.* She said the defendant offered to "split the insurance" with her if she would help kill the victim. *Id.* She also said the defendant's daughter later told her about the way her stepfather had been killed and that the two of them made an unsuccessful attempt to find the body. *Id.* On cross-examination, she admitted she had previously told another lawyer that she knew nothing about the case and that she had tried to adopt the illegitimate daughter of the defendant's daughter, but had been blocked in that attempt by the defendant. *Id.*

A third witness testified the defendant had offered him $10,000 "to get rid of her old man," saying the payment would come out of the insurance money. *Id.* He said she later inquired of him "a number of times" whether he was going to do this job for her. *Id.* He further admitted, however, that he had been unhappy because she had refused to see him any longer. *Id.* The Court of Criminal Appeals found, despite a vigorous dissent, that there was no independent corroborating evidence to connect the defendant with the crime alleged. *Id.* at 873. More specifically, the court determined there was no evidence apart from the accomplice testimony of the stepdaughter, which proved that the victim met his death on November 26, 1969, as alleged in the indictment. *Id.* The court noted that the autopsy report placed the date

of death at being approximately nine days later, and found no evidence (other than the accomplice testimony) showing the defendant had done anything in connection with the crime except make some drunken threats six months to a year before the murder. *Id.*

We have set forth the facts reported in *Reynolds* in some detail because of our difficulty in reconciling the court's decision with its holdings in other cases. *See e.g., Cawley v. State,* 166 Tex.Crim. 37, 310 S.W.2d 340, 342 (App.1957) (suspicious conduct, such as unexplained flight, held sufficient corroboration); *Washburn v. State,* 167 Tex.Crim. 125, 318 S.W.2d 627 (App.1958); *Cherb v. State,* 472 S.W.2d 273, 280 (Tex.Crim.App.1971) (suspicious circumstances, such as proof of the defendant's leaving with accomplice on the night of the burglary and later returning with him carrying a bag of coins, which the defendant hid, held sufficient corroboration). The majority's holding in *Reynolds* appears to have been focused on the State's failure to corroborate the accomplice-witness testimony regarding the *date* of the victim's death, about which there was conflicting evidence. Thus, there was disputed evidence concerning the defendant's connection with the victim's death, which could only be resolved through the testimony of the accomplice witness. We view the court's ruling in *Reynolds* to be confined to the narrow issue discussed, and, so viewed, the court's holding does not preclude our affirmance of the jury's verdict in this case.

■ In the instant case, there was independent testimony showing that: (1) appellant had been the subject of severe beatings by her husband over a period of time; (2) she had been overheard talking with Norma Jean Smith (who lived with Brown) about killing her husband; (3) she had increased her insurance coverage several weeks before the murder, which automatically doubled the insurance she carried on her husband's life, and asked unusual questions at that time about collecting the proceeds if anything happened to him; (4) she had dropped her husband's medical coverage; (5) she had engaged in nervous "hushed" conversations with Norma Jean Smith on the eve of her husband's death; and (6) she tried to file a claim for her insurance proceeds the day before her husband's funeral.

We find there was an accumulation of circumstantial evidence, independent of the accomplice testimony, which if believed by the jury would tend to connect appellant with the murder. This evidence, considered in its entirety, is sufficient to corroborate the accomplice-witness testimony.

We overrule appellant's first point of error.
*Points of Error Nos. Two and Three:*

■ In her second and third points of error, appellant contends there is insufficient evidence (1) that Oliver intentionally killed Nichols pursuant to an agreement for remuneration by appellant, or (2) to prove that Oliver ever made an agreement with appellant to kill Nichols.

The court's charge instructed the jury that a conviction of appellant required them to find, beyond a reasonable doubt, each of the following elements:

1. That appellant had employed or hired Brown and Oliver to kill Nichols; and
2. That appellant paid or promised to pay Brown and Oliver remuneration to kill Nichols; and
3. That Brown and Oliver agreed to kill Nichols pursuant to such employment by appellant; and
4. That, pursuant to such agreement for remuneration, Oliver intentionally killed Nichols by shooting him.

Appellant argues, under these points, that the State failed to prove either: (1) that Oliver killed Nichols pursuant to an agreement for remuneration by appellant; or (2) that Brown and Oliver had agreed with appellant to kill Nichols for remuneration. She asserts the State has a "heavy burden" in demonstrating that the murder was done for pecuniary gain, citing *Rice v. State,* 805 S.W.2d 432, 434 (Tex.Crim.App.1991), and that the State was required to prove, not only that appellant received monetary benefit from Nichols' death, but also that this benefit was the "animating force" behind Oliver's act. She contends that there was no evidence showing that Oliver was aware of any promise of remuneration at the time he killed

Nichols and that he acted with that promise in mind. She also argues there was no circumstantial evidence from which the jurors could conclude, beyond a reasonable doubt, that Oliver must have known of a promise to pay $500 and that he killed Nichols to receive that monetary benefit. She further argues, under her third point of error, that there is no evidence that appellant ever spoke to Oliver, much less agreed to pay him remuneration for killing her husband. Citing *Nickerson v. State*, 782 S.W.2d 887, 891 (Tex. Crim.App.1990), she maintains that, under the court's charge, the State was required to prove that she "specifically and personally" agreed with Oliver that he would kill Nichols for remuneration.

We find the evidence to be sufficient to support the jury's verdict under the court's charge. Brown testified that appellant agreed to pay him $5,000 to kill Nichols and that he told her he would not do it himself but could find someone who would. According to Brown, their conversation was overheard by Oliver, who told Brown he would commit the murder for $500. Brown later identified Oliver to appellant as the person who would do the killing. Oliver himself testified that a woman named Crawford wanted her husband killed and was going to pay him to get it done. When Brown asked him if he would kill someone, Oliver said he would if he were drunk enough. Both men testified that they went together to Nichols' house, where Oliver retrieved the loaded pistol from their truck and shot Nichols in the back.

The jury was entitled to infer from the evidence that appellant authorized Brown to find someone to kill her husband and agreed to pay him a monetary consideration for the performance of that deed. In essence, the evidence supports a finding that Brown acted as appellant's agent or representative in securing Oliver's agreement to kill Nichols for remuneration. *See Heberling v. State*, 834 S.W.2d 350, 354–55 (Tex.Crim.App.1992).

The jury was also authorized to find from the evidence that Oliver, as well as Brown, agreed with appellant to kill Nichols for remuneration. It was not essential to the State's case that it prove an actual conversa-tion or other direct communication between appellant and Oliver. It was sufficient for the State to prove: (1) the agreement between appellant and Brown; (2) Brown's agency; and (3) the understanding between Brown and Oliver. Although Oliver's testimony was at variance with Brown's in a number of material respects, the jury as the ultimate trier of fact was at liberty to accept those portions of the testimony it found to be credible and to reject the rest. *Thompson v. State*, 691 S.W.2d 627, 630 (Tex.Crim.App. 1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 184, 88 L.Ed.2d 153 (1985). Thus, the jury was entitled to disbelieve Oliver's testimony that Brown had not paid or promised to pay him anything for killing Nichols and that he, Oliver, had killed Nichols out of fear of Brown rather than for money.

We overrule appellant's second and third points of error.

*Point of Error No. Four:*

█ In her fourth point of error, appellant complains the trial court erred in admitting hearsay statements of Norma Jean Smith, Brown, and Oliver, arguing that such evidence was inadmissible in the absence of independent proof: (1) that a conspiracy existed; (2) that the declarant was a conspirator; (3) that appellant was a conspirator; (4) that the statements were made in the course and scope of the conspiracy; and (5) in furtherance thereof. She contends that the State failed to offer any independent evidence tending to show these persons acted together in a conspiracy and argues that the trial court erred in admitting their hearsay statements.

Specifically, appellant complains of Brown's testimony that: (1) Norma Jean "come to me and asked me if I would kill a man or if I knew someone who would, that her supervisor at work wanted her husband killed;" (2) he (in joinder to Norma Jean) would not do it but knew someone who would; (3) Norma Jean told him a few days later that appellant wanted to meet him; (4) Oliver asked him if he was going to kill this guy and Oliver's response that he, Oliver, would kill the guy for $500; (5) Norma Jean kept asking when Nichols was going to be killed; and (6) on the day Norma Jean gave

him $2,000, she had earlier told him she would bring him the money for killing Nichols that afternoon and that she had done so. Appellant argues that the State failed to show the existence of any conspiracy and, more importantly, appellant's participation in a conspiracy.

■ We overrule appellant's fourth point of error. There was independent evidence showing that appellant and Norma Jean Smith often talked about killing Nichols and that, on the night of this murder, both women acted nervous and secretive, talking together in hushed tones. The trial court was entitled to consider this independent evidence, and, using the hearsay statements as an aid, to determine whether the State met its burden of proving the necessary foundation requirements for the admission of such evidence. *See Bourjaily v. United States,* 483 U.S. 171, 179–80, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987). We cannot say the trial court abused its discretion in ruling the evidence was admissible. Moreover, the record shows that appellant waived any hearsay objection to Norma Jean Smith's statements because she failed to object until after Brown had testified about his conversations with Norma Jean: that she had come to him and asked if he would kill a man or knew someone who would; that her supervisor at work, Judy Crawford, wanted her husband killed; that he, Brown, would *not do it* but knew someone who would; and that she, Norma Jean, came back a few days later and told him that appellant wanted to meet him. It was only after this testimony was received without objection that appellant asked the trial court for a running objection to all hearsay statements of Norma Jean Smith. Appellant did not ask the court to strike the testimony that had already been received in evidence. To preserve error in the admission of evidence, the defendant must timely object and obtain the court's ruling on the objection. *See Gonzales v. State,* 685 S.W.2d 47, 50–51 (Tex.Crim.App.), *cert. denied,* 472 U.S. 1009, 105 S.Ct. 2704, 86 L.Ed.2d 720 (1985).

Appellant's fourth point of error is overruled.

*Point of Error No. Five:*

■ In her fifth point of error, appellant contends the admission of John Brown's post-arrest hearsay statements was erroneous and improperly bolstered his credibility. She complains that Rick Wiatt, a former police officer with the Tyler police department's Crime Stoppers Division, was permitted to testify, over appellant's objection, that Brown, shortly after his arrest, had confessed that he had been hired by a woman to kill her husband in Trinity and that he had not pulled the trigger, but had gotten someone else to do it for him. The witness was also allowed to elaborate on the details of the confession, including Brown's insistence that he did not want Norma Jean involved in any way. Appellant contends that all this testimony was inadmissible testimony and that it "did not qualify as a prior consistent statement made prior to any motive to fabricate or falsify arose since from the moment John Brown was arrested he had an overwhelming motive to curry favor with the prosecution and shift blame from himself."

■ A prior consistent statement is admissible if "offered to rebut an express or implied charge against [the witness] of recent fabrication or improper influence or motive." TEX.R.CRIM.EVID. 801(e)(1)(B). But the prior statement is inadmissible if it is made after the motive or inducement to fabricate existed. *Campbell v. State,* 718 S.W.2d 712, 715 (Tex.Crim.App.1986). Brown already had a motive to fabricate his story when he gave his first statement to Wiatt in Tyler. Therefore, we must examine the inadmissible evidence to determine whether harm resulted to appellant.

The prior statement made by Brown to his ex-wife, Debbie Brown, which is not the subject of complaint on appeal, contained much of the same information as that given by Brown to Officer Wiatt. In essence, Brown admitted to his ex-wife that he had killed a man in Trinity; that Smith and the victim's wife were involved; and that the wife was to pay him $5,000, of which he received $2,000. The testimony of Debbie Brown, though objected to as hearsay, was in evidence at the time Officer Wiatt testified, and her testimony is not the subject of complaint on appeal.

We conclude that no reversible error has been shown. Although Brown's statements to his ex-wife differed from those given to Officer Wiatt, in that he told his ex-wife that he had done the killing, both statements were consistent in showing the complicity of the victim's wife in the murder-for-hire scheme. Most importantly, the statements made to Debbie Brown clearly qualify as prior consistent statements made before motive or inducement to fabricate existed.

We overrule appellant's fifth point of error.

*Point of Error No. Six:*

Appellant asserts in her sixth point of error that the trial court erred in failing to subpoena a Crime Stoppers' report and review it *in camera* for material relevant to appellant's cross-examination of Officer Rick Wiatt. Citing *Thomas v. State*, 837 S.W.2d 106, 113 (Tex.Crim.App.1992), she contends she was constitutionally entitled to the production of the report for *in camera* inspection for possible *Brady*[1] material. In response to the State's argument that she waived this right because she failed to subpoena the report before trial, she explains that she had no hint that Wiatt had such a report before he announced its existence during his cross-examination.

During Wiatt's cross-examination, appellant's counsel pointed out that his testimony at trial contained more information than the data set forth in his offense report. His response was that the missing information was contained in the Crime Stoppers' report. Appellant then asked for a copy of that written statement pursuant to Tex.R.Crim.Evid. 614, which provides in pertinent part:

(a) **Motion for Production.** After a witness other than the defendant has testified on direct examination, the court, on motion of a party who did not call the witness, shall order the attorney for the State or the defendant and his attorney, as the case may be, to produce, for the examination and use of the moving party, any statement of the witness that is in their possession that relates to the subject matter concerning which the witness has testified.

Sections 414.007 and 414.008 of the Texas Government Code provide:

**Section 414.007. Confidentiality of Council Records.** Council records relating to reports of criminal acts are confidential.

**Section 414.008. Privileged information.**

(a) Evidence of a communication between a person submitting a report of a criminal act to the council or a local crime stoppers program and the person who accepted the report on behalf of the council or local crime stoppers program is not admissible in a court or an administrative proceeding.

(b) Records of the council or a local crime stoppers program concerning a report of criminal activity may not be compelled to be produced before a court or other tribunal except on the order of the supreme court.

Tex.Gov't Code Ann. §§ 414.007, 414.008 (Vernon 1990).

During a recess, the trial court determined that the report could not be released without an order of the Texas Supreme Court and that such action might take several days. The trial court then denied appellant's request, refused her motion to strike Wiatt's testimony, and overruled her motion for a mistrial.

■ Pursuant to the ruling in *Thomas*, appellant was entitled to have the trial court inspect the Crime Stoppers' report *in camera* to determine if it contained *Brady* information. However, it was appellant's burden to obtain this information, if possible, without unduly delaying the orderly trial process. There is no showing that appellant sought to obtain the report through an extraordinary proceeding, such as the defendant attempted in *Thomas;* and, in the absence of such a showing, we cannot say that the court abused its discretion in refusing to recess the trial for an indefinite time to enable appellant to obtain the report.

---

1. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) ("suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution").

We find that reversible error has not been demonstrated, and we overrule appellant's sixth point of error.

*Point of Error No. Seven:*

■■■■ Appellant argues the State failed to prove the past remuneration to Oliver, because Brown said that Oliver could have considered the $200, which Brown had given him, as payment for other work he had done for Brown, and that Brown himself said he did not consider it either way. The sufficiency of the evidence to convict must be measured by the charge that was given to the jury. *Nickerson v. State,* 782 S.W.2d 887, 891 (Tex.Crim.App.1990). Since the charge allowed the conviction if the State proved either past *or* future payment, the State did not have to prove past remuneration. The evidence that Oliver agreed to kill Nichols for $500 is sufficient to convict.

Appellant's seventh point of error is overruled.

*Point of Error No. Eight:*

■■■■ In point of error eight, appellant asserts the court's charge improperly allowed conviction if the State proved *either* remuneration *or* the promise of remuneration because the indictment specifically alleged payment *and* promise of payment.

■■■■ When a penal statute lists more than one way of committing a crime, the statute will list them in the disjunctive. *Nickerson,* 782 S.W.2d at 891 (quoting 6 P. McClung, Jury Charges for Texas Criminal Practice (Indictments and Information) (1983)). However, the "State's pleading should list them in the conjunctive," and the "jury charge should list them (when they have been proved or sustained by the evidence) in the disjunctive." *Id.*

The statute under which appellant was convicted provides;

(a) A person commits an offense if he commits murder as defined under Section 19.02(a)(1) of this code and:

. . . .

(3) the person commits the murder for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration.

Tex.Penal Code Ann. § 19.03 (Vernon 1989).

The indictment properly listed the alternative methods of committing the offense in the conjunctive, as stated in *Nickerson.* The jury charge also conforms to *Nickerson,* because it lists the alternative methods in the disjunctive.

Appellant's eighth point of error is overruled.

*Point of Error No. Nine:*

■■■■ In her ninth point of error, appellant asserts that the court's definition of "intentionally" in its charge improperly included a reference to "the nature of his conduct" and an intention "to engage in the conduct" when capital murder is a result-oriented offense, not a conduct-oriented offense.

In *Alvarado v. State,* 704 S.W.2d 36, 37 (Tex.Crim.App.1985), the court found the trial court erred by failing to limit its charge on the applicable culpable mental states to those appropriate to the case. *Alvarado* involved the offense of injury to a child, in which the focus of the pertinent culpable mental states in the applicable statute is on the "result of conduct," that is, "serious bodily injury." *Id.* at 37. Instead of giving the jury the requested charge, the trial judge charged the jury in the entire language of section 6.03(a) and (b) of the Texas Penal Code. *Id.* at 37. The court held the charge was in error because it permitted the jury to convict the defendant if it found that she knowingly or intentionally placed the child in a tub of hot water without requiring a finding that she intended or knew that serious bodily injury would result. *Id.* at 39–40. The *Alvarado* court stated:

[T]he injury to a child statute, like the homicide and other assaultive proscriptions, does not specify the "nature of the conduct." Clearly then, the "nature of conduct" in these offenses is inconsequential (so long as it includes a voluntary act) to the commission of the crimes. What matters is that the conduct (whatever it may be) is done with the required culpabil-

ity to effect the *result* the Legislature has specified.

*Id.* at 39.

The *Alvarado* case was distinguished, however, in *Kinnamon v. State,* 791 S.W.2d 84 (Tex.Crim.App.1990), which involved a defendant who had been convicted of capital murder. The charge to the jury in *Kinnamon* was identical to the charge in the instant case and read as follows:

> A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.

*Id.* at 87. The court stated that the definition complained of must be examined in the context in which the defined term appears, and not limited to portions of a charge standing alone. *Id.* The court's charge contained an application paragraph which explained the term "intentional." *Id.* at 87–88. This application paragraph contained language such¹ as "you must find ... that ... defendant ... shot Ronald Charles Longmire with a gun with the *intention* of thereby causing his death," "that the defendant ... specifically *intended* to cause the death of Ronald Charles Longmire," and "that ... defendant ... *intentionally* cause[d] the death of Ronald Charles Longmire by shooting [him] with a gun." *Id.* at 88.

In the instant case, the jury charge contained an application paragraph similar to the one in *Kinnamon.* This charge contained language such as "if you find ... that ... defendant ... did *intentionally* cause the death of William Sidney Nichols," "with specific *intent* to cause the death of William Sidney Nichols," and "that ... defendant ... did *intentionally* kill the said William Sidney Nichols by shooting him with a deadly weapon."

▮▮ Capital murder is a "result of conduct" offense. *Kinnamon,* 791 S.W.2d at 88. The accused must be found to have intended to engage in the act that caused the death and must have specifically intended that death resulted from that conduct. *Id.* at 88–89. When the definitional charge was limited by the application paragraph in *Kinnamon,*

the court held that the defendant was not convicted because he engaged in the conduct of pulling the trigger of a gun, but because his objective was to cause the death of the deceased. *Id.* at 89. The phrase "engage in conduct" in the abstract definition of "intentional," when read in conjunction with the application paragraph, did not provide for any additional degree of culpability. *Id.*

In the instant case, when the abstract definition of "intentional" is read together with the application paragraph, no additional degree of culpability can be applied.

Appellant's ninth point of error is overruled.

The judgment is affirmed.

COHEN, Justice, concurring and dissenting.

I agree with the majority, except for the disposition of point of error six.

Relying on *Thomas v. State,* 837 S.W.2d 106 (Tex.Crim.App.1992), appellant contends the trial court should have ordered production of a Crime Stoppers report she requested during cross-examination of Officer Wiatt. John Brown had testified he told Officer Wiatt that he (Brown) had promised to pay T.R. Oliver $500 for this murder. Officer Wiatt testified to the same fact. Officer Wiatt was impeached on cross-examination when defense counsel pointed out that this important statement by Brown was not mentioned in Wiatt's offense report. Wiatt conceded that, but responded that he had recorded Brown's statement to that effect in his Crime Stoppers report. Appellant requested the Crime Stoppers report to see if Wiatt was telling the truth. If the report had been examined by the trial judge and did not contain any such statement, the trial judge would have been required to disclose that to appellant. *Thomas,* 837 S.W.2d at 112; *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). The absence of such a statement in the Crime Stoppers report could have significantly affected the credibility of both Brown and Wiatt. *Thomas,* 837 S.W.2d at 112. None of this is disputed by the State.

**168**

Under similar circumstances in *Thomas,* the Court of Criminal Appeals held due process of law requires that the Crime Stoppers report be produced and examined by the trial judge *in camera,* but not disclosed to the attorneys. 837 S.W.2d at 114. The trial judge was required to determine whether the Crime Stoppers report contained material evidence favorable to the defendant, *see Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963), and to disclose it to the defendant if it did. In addition, the trial judge was required to make fact findings and seal the report for appellate review. 837 S.W.2d at 114. I believe we should follow that procedure here.

The majority declines to follow this procedure because appellant did not seek to obtain the Crime Stoppers report from the Texas Supreme Court, as required by Tex.Gov't Code Ann. §§ 414.007–.008 (Vernon 1990). Except for the holding in *Thomas,* I would agree. In *Thomas,* the appellant sought relief from the Texas Supreme Court, which denied it. 837 S.W.2d at 108. Nevertheless, he was granted relief on direct appeal. The Court of Criminal Appeals held that production was constitutionally required even though the Texas Supreme Court had denied production. *Id.* at 113–14. If Thomas was entitled to production even though he had been denied it by the Texas Supreme Court, I do not see how we can deny it to appellant here. Why require a defendant to seek relief in the supreme court when the trial court has a constitutional duty to grant the same relief?

*Thomas* holds that in circumstances like these, the defendant is entitled to production of the record by criminal law courts, even if the Texas Supreme Court refuses to grant it. If, like Thomas, appellant was entitled to this relief even without the supreme court's approval, I see no purpose in requiring her to seek that approval. Relief should instead be sought from the person presently in charge who has both the power and the duty to order production—the trial judge. Appellant did that. She moved for production under Tex.R.Crim.Evid. 614, just like Thomas did. 837 S.W.2d at 108 n. 3.

I think the holding in *Thomas* has effectively repealed subsection (b) of section 414.-008, which says that only the supreme court may compel production of a Crime Stoppers report. *Thomas* holds that both the trial court and the Court of Criminal Appeals may do so. If both of those courts have a constitutional duty to produce the record even after the supreme court has refused, I believe we also have the same constitutional duty even though the supreme court has not been asked for relief.

I would defer ruling on point of error six and order the trial judge to follow the procedure set out in *Thomas* and send to us his findings of fact and the sealed Crime Stoppers report. After receiving those, I would rule on point of error six.