Affirmed and Memorandum Opinion
filed August 23, 2011.

 

In
The

Fourteenth
Court of Appeals



NO. 14-10-00437-CR



Clyde Henry
Crump, Appellant 

v.

The State of
Texas, Appellee 



On Appeal from
the 179th District Court

Harris County, Texas

Trial Court
Cause No. 1119150



 

MEMORANDUM OPINION 

Appellant, Clyde Henry Crump, appeals from his
conviction for capital murder.  A jury found appellant guilty, and he was
sentenced to life in prison without the possibility of parole.  On appeal,
appellant contends that (1) the evidence is legally insufficient to sustain his
conviction; (2) accomplice witness testimony was not sufficiently corroborated;
(3) the trial court erred in failing to instruct the jury that certain
witnesses were accomplices; (4) the court erred in failing to instruct the jury
that one accomplice witness cannot corroborate the testimony of another
accomplice witness; and (5) he received ineffective assistance of counsel.  We
affirm.

I.  Background

            The State’s
theory of the case was that appellant hired another individual, Brandon Brown,
to kill complainant, Eugene Bourgeois, whom appellant suspected of having
orchestrated a violent home invasion of appellant’s apartment.

The first witness called was Deputy Douglas Levy of
the Harris County Sheriff’s Department.  Levy testified that on February 21,
2007, he responded to a call reporting a possible home invasion at the Camden
Station Apartments.  Appellant met Levy at the door to appellant’s apartment
and explained that two men whom he did not know had forced their way into his
apartment, hit him on the head with a pistol, tied him up, and stolen some of
his property.  Appellant was bleeding from his head, and Levy described
appellant’s demeanor at the time as “angry.”  Levy also interviewed Requitta
Henry at the apartment.  Henry reported that she had woken to find a man
pointing a shotgun at her.

            On February 27,
Levy responded to a call reporting a possible shooting and death at the Camden
Station Apartments.  Eugene Bourgeois had been shot and killed at that
location.  Information obtained at the scene indicated a suspect in the
shooting possibly lived in the same apartment where Levy had responded to a
home invasion call six days before.  Levy interviewed Juanita Ornelas, who told
him that she heard four gunshots outside her apartment, and when she looked out
the window, she saw a young black male running through the parking lot carrying
a large gun.  She could not identify the man by name but indicated she believed
he lived at the same apartment that Levy knew to be appellant’s apartment.

            Sergeant Robert
Spurgeon, also of the Harris County Sheriff’s Department, testified that between
February 21 and 26, 2007, he was assigned to investigate the purported home
invasion at appellant’s apartment.  In a telephone conversation, appellant told
Spurgeon that he believed that a black male whom he knew as “Tank” had “set him
up.”  Appellant, however, was unable to provide a real name or address for
Tank.  Spurgeon did not hear from appellant again after that telephone call. 
Numerous witnesses explained that “Tank” was a nickname associated with the
decedent, Eugene Bourgeois.

            Detective James
Dalrymple is a crime scene investigator with the sheriff’s office.  On February
27, 2007, he responded to a call at the Camden Station Apartments.  He
generally described the scene where Bourgeois’s body was found, including that
the body was “lying partially behind [some] shrubs, partially behind [an] air
conditioning unit.”  Five shotgun shells were discovered nearby, along with
other indications that a shotgun had been recently discharged.  Dalrymple
opined that the wound pattern found on Bourgeois’s body was consistent with a
shotgun blast.  A pistol was discovered in Bourgeois’s pocket, and his vehicle
was in the parking lot.  Additionally, Sara Doyle, with the Harris County
Medical Examiner’s Office, testified that Bourgeois died as a result of wounds
caused by a shotgun blast.

            Amos Oladimeji
testified that around 6:30 a.m. on February 27, 2007, he arrived at the Camden
Station Apartments to pick up workers for his landscaping business.  He saw a
vehicle back into a parking space and then someone emerged from the driver’s
side, wearing a hood and carrying a long gun wrapped in something.  The man
from the vehicle chased another man and then shot him multiple times.  The
victim then fell on an air conditioning unit.  Because of the hood and the
darkness, Oladimeji was unable to see the shooter’s face.  The shooter quickly
returned to his vehicle, and the vehicle left the parking lot.  Oladimeji
described the vehicle as a “dark, old model car.”  He did not look inside the
car and thus was unable to tell how many people might have been inside.  

            In his testimony,
Sergeant Henry Palacios of the sheriff’s department described interviewing
witnesses on the morning of the shooting, including Juanita Ornelas and her
sister and brother-in-law (the Hernandezes).  From them, Palacios received a
description of an older, light-brown vehicle belonging to the Hernandezes’
neighbor.  Palacios further ascertained that appellant lived next door to the
Hernandezes.  Subsequently, Palacios went to the Camelot Inn to retrieve two
duffel bags believed to have been left at the hotel by a suspect in the
shooting.[1] 
Inside one of the bags was a card addressed to “Elvira Brown” from Brandon
Brown, a journal containing both of those names and a photograph Palacios
identified as being of Elvira and Brandon.

            Elvira Lewis testified
that in February 2007, she was 17 years old and living with Brandon Brown at
the Camden Station Apartments.  Brown sold cocaine to pay the couple’s bills. 
She identified appellant as a friend of Brown’s whom they called “Slug.”  Brown
would buy marijuana from appellant and sometimes smoke it with him.  She
further acknowledged that she knew someone who went by the name “Tank” because
she sometimes saw him around the apartment complex.  She described one “run-in”
that they had when she did not want to talk to Tank because she didn’t know him
and already had a boyfriend.  Brown came downstairs during the altercation and
“got into it” with Tank, telling Tank to stay away from Lewis.  According to Lewis,
Brown was “pretty angry.”  Another time, Tank knocked on their door and asked Brown
to “cook him up some crack cocaine”; Brown refused, Tank tried to push his way
in, and Brown pushed him out.  The two incidents occurred a week or two apart
and about a month before the shooting.  After one of the incidents, Tank
brought someone by Brown and Lewis’s apartment.  Lewis felt threatened by this
and told Brown so.

Lewis also acknowledged that she had informed Brown that
Tank wanted to hire someone to kill a friend of Brown’s; the friend went by the
name “C. Slugger.”  She told him that if Tank “would do it to [C. Slugger], he
would definitely do it to Brandon.”

            Lewis further
testified that appellant had told Brown, and Brown, in turn, told her, that
Tank had arranged to have someone break into appellant’s apartment.  Appellant said,
“I know Tank broke into my house, and I’m going to get him,” and “he not going
[sic] to bring it to nobody’s house, me and my goons going [sic] to get him.” 
After the break-in, Brown began visiting with appellant more often.  Brown also
began “acting weird . . . like he was scared about something.”  Brown told Lewis
about a deal he had with appellant.  Lewis also overheard appellant tell Brown
that he would pay Brown to kill Tank.  She believed that Requitta Henry was
also present during that conversation.  Lewis did not know of a particular
amount being mentioned but did know the payment was to be made afterwards. On
the morning that Bourgeois was killed, Lewis and Brown packed bags so that they
could go to a hotel because appellant had said that Brown was going to kill
Tank.

            While packing
their bags, Brown appeared nervous and scared.  Afterwards, they went to
appellant’s apartment where appellant and Henry were.  Around 5:30 a.m., they all
got into appellant’s car in the parking lot.  Appellant was sitting in the
driver’s seat, Requitta was in the front passenger seat, Lewis was in the rear
passenger’s-side seat, and Brown was in the rear driver’s-side seat.  Brown had
brought his shotgun with him to appellant’s apartment and then to the car.  It
was wrapped in a pillow case.

            When Tank drove
into the parking lot and parked, the four people in appellant’s car “ducked
down” and then Brown got out of the vehicle and began shooting.  He shot four
times and then ran back to the car.  Appellant got out and opened the trunk so
that Brown could put the gun in.  They then drove to the Camelot Inn.  Once in
a room at the hotel, appellant told them that it was their room and that he
“and his mama [were] going to get rid of the gun.”  Later, appellant and Henry
returned to give Brown $60 and some cigarettes.  Lewis also heard appellant
make the statement at this time:  “I’ll give you the rest.”

Lewis and Brown subsequently went to the apartment of
one of Brown’s friends, and there Lewis cut Brown’s hair to disguise his
appearance.  Brown took a bus to Louisiana later that night in order to see his
mother.  Lewis said that she had not been promised anything in return for her
testimony.  After giving a statement to the police, she pleaded guilty to
misdemeanor failure to report a felony and served time in jail for the offense.
  After the shooting, Lewis learned that she was pregnant with Brown’s child. 
At the time of trial, the child was two years old.

Requitta Henry testified that she met appellant when
she went to purchase marijuana from him and knew him by the name “Slug.”  They
became romantically engaged and she frequently stayed at his apartment. 
Appellant’s mother also was living there.  Henry described one morning around 6:00
a.m. when someone entered appellant’s apartment and told her not to move and
that they were “here for [her] man.”  She stayed with her head under the covers
and did not see anyone.  After they left, she found appellant with his hands
tied and blood coming from his head.  Appellant’s cell phone and wallet were
missing along with some money and marijuana. Appellant called the police. 
Appellant told her that he thought a man named “Tank had something to do with”
the robbery.  Appellant said the he was going to “make example of him [sic].” Regarding
Bourgeois, Henry stated that she knew him as “Tank” and appellant sometimes
talked with him, but she never had any interaction with him.  She did not know
whether or not he had anything to do with the robbery.  She knew from Brown
that Bourgeois regularly drove a child from the apartment complex to school in
the mornings.  On the morning of February 27, 2007, Henry, Brown, and Lewis
were at appellant’s apartment.  At some point, the four of them went to
appellant’s car.  They sat, listened to the radio, and talked.  There was a
shotgun in the car.  When Brown got out of the car, Henry heard shots.  She had
her head down, however, and did not see what happened.  Brown got back in the
car, said “I got him,” and they drove to a hotel named “Camelot.”  Appellant’s
mother had rented two rooms earlier that morning at the hotel.  Brown and Lewis
stayed in one room and appellant’s mother in the other.[2]  After
giving Brown money for food, appellant woke his mother up so she could go to
work.  He told her, “It’s done, come on, we got to go.”  Henry then parted
company with appellant and appellant’s mom.  Appellant later told Henry that
they “went to bury the gun.”  Henry said that she had not been arrested and
that she was not promised anything for testifying and had been subpoenaed.  

Morris Crosby testified that in early 2007, he was 14
and living at the Camden Station Apartments.  He considered Brown, who was 15
at the time, to be like a brother to him.  At that time, Crosby’s mother was paying
Bourgeois to drive Crosby to school each day.  Based on conversations with Brown,
Crosby knew that Brown did not like Bourgeois.  Crosby also saw Brown and
Bourgeois have “run-ins.”  After appellant’s apartment was robbed, Crosby had
conversations with Brown about “getting back at” Bourgeois.

According to Crosby, appellant also specifically told
him that Bourgeois had set up the robbery of his apartment and “was going to
get what he deserved.”  Appellant further expressed concern about what could
have happened if one of his children had been present at the time of the
robbery.  Neither Brown nor appellant talked about “getting back at” Bourgeois
prior to the home invasion.  During this period, appellant kept asking Crosby
for the exact time when Bourgeois picked him up for school in the mornings. 
Crosby also talked to Brown about whether Bourgeois was going to pick Crosby up
for school on the day of the shooting.

The morning of the shooting, Brown came to Crosby’s
apartment to say goodbye.  He left at around 6:20 a.m., and Crosby saw him pick
up something from outside the apartment that was long and wrapped in cloth of
some sort.  Crosby thought it was a gun.  Around 6:45 a.m., Crosby heard
Bourgeois honk his horn.  Crosby looked out and saw Bourgeois’s car and shortly
thereafter heard gunshots.  Crosby heard his mom say, “That’s Brandon,” but she
would not let Crosby go outside.  

Tony Patel, manager of the Camelot Inn, testified
that Laverne Barlette Crump rented two rooms at the motel at 2:57 a.m. on
February 27, 2007.  He also stated that a package of items left in the rooms
was handed over to police.

Elizabeth Simpson testified that in February 2007,
she was a property manager for Camden Station Apartments.  Between February 21
and 27, appellant came to her office and complained that two men had broken
into his apartment, pistol-whipped him, and stolen his wallet.  Appellant
asserted that it was “some dude from Louisiana.”  Appellant wanted out of his
lease, but Simpson explained the request would need to be made in writing and
the decision to release him was not within her authority.  Appellant
subsequently submitted a letter to her explaining that he wanted out of his
lease due to the home invasion and not feeling safe living there anymore.  The
day of the shooting, February 27, appellant returned to her office and asked
about the status of his request to be excused from the lease, but Simpson did
not have an answer for him yet.  

George Bergeron, a police officer with the Hammond,
Louisiana police department, testified that on February 28, 2007, he responded
to a report that a juvenile wanted to discuss a homicide that had occurred in
Houston.  At an apartment in Hammond, Bergeron spoke with Brandon Brown and
Brown’s mother.  Brown told Bergeron three different versions of the events
surrounding Bourgeois’ murder.

Rodney Kemper testified that in 2007, he used to buy
marijuana from and “hang out” with appellant.  At some point, appellant told
Kemper that his apartment had been robbed and that he thought someone named
Tank was behind it.  Appellant also told Kemper that Tank was “going to get
it.”  

Sergeant Eric Clegg of the Harris County Sheriff’s
department was the lead investigator in the murder investigation.  He travelled
to Louisiana to interview Brown.  Brown told him that appellant had paid him to
kill Bourgeois.  According to Clegg, he had no doubt Brown was telling him the truth
because Clegg knew details about the crime scene Officer Bergeron did not.

Shannon Rosemond testified that she was Bourgeois’s fiancée
at the time of his death.  She described appellant (whom she referred to as “Slug”)
and Bourgeois having arguments because appellant had been selling drugs at an
apartment complex and Bourgeois began doing so.  She also learned from
Bourgeois about his altercations with appellant and Brown.

Brandon Brown testified that he understood that he
had the right not to testify and had not been offered any deal by the district
attorney’s office in exchange for his testimony.  He was 15 in February 2007
and was living in an apartment at the Camden Station Apartments, selling drugs
and robbing people for money.  Brown acknowledged having had several conflicts
with Bourgeois, including one time when Bourgeois sold drugs to a customer
before Brown could, another when Bourgeois wanted to enter Brown’s apartment
and have Brown prepare cocaine for him but Brown refused, and another when
Bourgeois was bothering Elvira Lewis, Brown’s girlfriend.  Brown regularly
bought marijuana from appellant and “hung out” with him.  Appellant told him on
the day of the home invasion that he thought Bourgeois had sent someone to do
it.  This was apparently based on the fact Bourgeois left a message on
appellant’s voicemail that morning and the robbers had asked where appellant’s
gun was and Bourgeois knew that appellant had a gun in his house.  Appellant said
that “[h]e was going to get somebody to get him.”

At some point, Brown told appellant about the fact
that Bourgeois took Crosby to school each day.  Appellant told Brown that he
needed someone to kill Bourgeois, that he was going to pay someone to do it,
and that he knew the going rate.  Around midnight on the night before the
shooting, appellant came to Brown’s apartment and told Brown that he wanted him
to kill Bourgeois.  Appellant indicated to Brown that he was going to pay him
to do it and that he (appellant) knew the “going rate.”  Appellant said that he
was going to rent a hotel room and pay and take care of Brown after the
shooting.  Brown could also stay with him afterwards.  Appellant never
mentioned a specific dollar figure.  He then left Brown’s apartment to procure
the hotel room.

Brown stated that although he did not tell Lewis or
Crosby specifically what was going to happen to Bourgeois, he did mention to
them that Bourgeois was going to get some form of retaliation.  After his
midnight conversation with appellant, Brown knew that he was going to shoot
Bourgeois and that appellant was going to “pick up the shells.”  When appellant
left, Brown began packing his clothes and told Lewis to do the same.  At some
point, appellant contacted Brown to let Brown know that he was back at the
apartment complex.  Appellant also told Brown to make sure Bourgeois was coming
to pick up Crosby for school.  Brown then went by Crosby’s house to tell Crosby
that he was leaving and to make sure Bourgeois was still coming that morning.  

Brown thereafter took his shotgun to appellant’s
apartment, where appellant, Henry, and Lewis were already gathered.  While at the
apartment, appellant told Brown that because Brown was younger, Brown would not
get as much time if he got caught.  After about an hour, they all went to
appellant’s vehicle, a brown Chrysler.  When Bourgeois’s car pulled into the
parking lot, they all ducked down in the car.  Brown then exited the car with
the shotgun.  Bourgeois saw Brown and began running, Brown fired the shotgun,
and Bourgeois fell to the ground and started to crawl.  Brown pursued and shot
Bourgeois until the gun was empty.  He then ran back to the car, and appellant
“turned on a song” as they drove away.

They proceeded to the Camelot Inn, where Brown and
Lewis went to one room, and appellant and Henry to another.  Appellant gave
Brown $60 and told him that he would take him to get his hair cut.  Later,
Lewis trimmed Brown’s hair, and then he got a haircut at a barber shop.  He then
left on a bus to Louisiana.  Once there, he soon began telling people (his mother,
grandparents, pastor, and pastor’s wife) about events in Texas because he
wanted to do what was right.  He claimed that he had not known how to get out
of it before the shooting took place.  He did not just leave because he did not
want to abandon Lewis, and his mother had said that Lewis could not come live
with them.  His mother told him he needed to talk to the police, so the Hammond
police were called, and he began talking.  At some point, he changed his story
and began saying appellant was the shooter because he became worried about what
was going to happen to him.  He later decided he could trust an officer from
Texas and told the real story.  He said that he understood that a murder for
hire is a capital murder and that is a more serious crime than mere murder.  

On cross-examination, Brown acknowledged that a different
friend of his, Willy Williams, had been robbed and believed that Bourgeois was
behind it.  He also said that Crosby had a headache on the morning of the
shooting and contemplated not going to school, but Brown talked him out of
calling Bourgeois to cancel his ride.  He acknowledged telling an officer a
price for the murder at one point but it was not the truth.

Appellant testified that he was robbed in his
apartment on February 21, 2007.  He told apartment complex management that he
did not feel safe and wished to move.  Brown told him about who was behind the
robbery, but appellant says that he did not act on that information or ask
Brown to act on that information.  He felt like a big brother to Brown.

Appellant denied that he went to Brown’s apartment
the night before the shooting.  That morning, however, Brown came to
appellant’s apartment while appellant was preparing to take his mother to
work.  Later, when appellant left his apartment, he saw Brown standing beside
some bushes with a shotgun in his hand.  Appellant told Brown to get in his
car; Brown did so, and appellant tried “to talk some sense into him.”  When another
car pulled into the parking lot, Brown got out of appellant’s car, and then appellant
heard several gunshots.  There was no agreement between them regarding what
Brown did.  Brown then jumped back in appellant’s car, and appellant drove the
two of them plus Henry and Lewis to a hotel, where appellant’s mother had
rented rooms because they did not feel safe staying in the apartment.  Appellant
gave Lewis $60 so that she and Brown could eat.  

On cross-examination, appellant acknowledged that he
wanted the robbers to pay for what they did.  He explained that he couldn’t
rent a hotel room himself because the robbers had taken his wallet which held
his identification, and thus he needed his mother’s assistance.  He admitted that
he had learned from Brown that Bourgeois was scheduled to pick up Crosby.  He
further acknowledged that he did not stay at the hotel after the shooting but immediately
went back to his apartment, while avoiding the police officers at the complex. 
He said that he did not report the shooting to police, even after he saw himself
on the news as a suspect, because he did not want to be involved.  He admitted
telling Henry that he was going to “make an example of” Bourgeois and telling
Rodney Kemper that Bourgeois was “going to get it, he’s going to get what’s
coming to him.”  He contended that he rented the room at the hotel at 10:00
p.m. the day before the shooting and not in the middle of the night as hotel
records showed.

II.  Sufficiency of the Evidence

            In his first two issues,
appellant contends that the evidence is legally insufficient to support his
conviction for capital murder.  We review the legal sufficiency of the evidence
under the standard set forth in Jackson v. Virginia, 443 U.S. 307
(1979).  Gear v. State, 340 S.W.3d 743, 746-48 (Tex. Crim. App. 2011). 
Under that standard, we view all of the evidence in the light most favorable to
the verdict to determine whether a rational jury could find the essential
elements of the crime beyond a reasonable doubt.  Isassi v. State, 330
S.W.3d 633, 638 (Tex. Crim. App. 2010); Williams v. State, 235 S.W.3d
742, 750 (Tex. Crim. App. 2007).  This court does not sit as a thirteenth juror
and may not substitute its judgment for that of the fact finder by
re-evaluating the weight and credibility of the evidence.  Isassi, 330
S.W.3d at 638; Williams, 235 S.W.3d at 750.  Instead, we defer to the
fact finder to fairly resolve conflicts in the testimony, weigh the evidence,
and draw reasonable inferences supported by the evidence.  Williams, 235
S.W.3d at 750.  Our duty as a reviewing court is to ensure that the evidence
presented actually supports a conclusion that the defendant committed the
crime.  Id.

As properly set forth in the jury charge, a person
commits capital murder if, among other possibilities, he intentionally commits
murder by employing another person “to commit the murder for . . . the promise
of remuneration.”  Tex. Penal Code § 19.03(a)(3).  Murder is properly defined
as “intentionally or knowingly caus[ing] the death of an individual,” or “intend[ing] to cause serious bodily injury and commit[ing]
an act clearly dangerous to human life that causes the death of an individual.” 
Id. § 19.02.

A.  Mental State

            In his first
issue, Appellant asserts that there was no evidence to establish he possessed
the requisite mental state for capital murder, i.e., that he acted with
intent for Bourgeois to die.  Appellant insists that he tried to talk Brown out
of committing the crime and points out that Brown did not testify that he told
anyone beforehand that appellant hired him to kill Bourgeois.  According to
appellant, Brown had a will of his own and a motive of his own for wanting
Bourgeois dead.  Brown also initially lied to the Louisiana police officer,
telling him that appellant was the shooter.  Appellant further points to
evidence suggesting he desperately wanted out of his lease after the home
invasion at his apartment.

While the jury may well have taken all of this
evidence into account, there was ample evidence to support its ultimate
conclusion that appellant intended for Bourgeois to be killed and acted on that
intention.  As detailed above, appellant’s own testimony, as well as that of
several others, demonstrated that he had a motive for wanting Eugene Bourgeois
killed:  information or belief that Bourgeois had been behind a violent home
invasion of appellant’s apartment.[3] 
There was also evidence that prior to the shooting, appellant indicated that he
was going to get revenge on Bourgeois for the home invasion, and appellant made
inquiries into if and when Bourgeois was going to arrive at the apartments on
the morning of the shooting.

It was further clearly established that Brandon Brown
shot and killed Bourgeois.  By his own testimony, and as corroborated by
others, appellant was present at the scene of the shooting and aided the
shooter, Brown, in the immediate aftermath by driving him from the scene,
putting him up in a hotel room, and providing money for food.  There was also
testimony from multiple sources, principally Brown and Elvira Lewis, from which
the jury could have concluded that appellant promised to pay Brown for shooting
Bourgeois.  In short, the evidence that appellant possessed a motive for
wanting Bourgeois killed, promised to pay Brown for killing Bourgeois, and then
aided Brown in the aftermath of the shooting was ample evidence to demonstrate
the required mental state for capital murder.  The jury was well within its
authority to reject evidence suggesting Brown acted completely on his own.  See
Williams, 235 S.W.3d at 750 (explaining that the jury is responsible for
assessing the credibility of witnesses and resolving conflicts in the
evidence).  We overrule appellant’s first issue.

B.  The Promise of Remuneration

            In his second
issue, appellant argues that the evidence is insufficient to demonstrate that
he employed another to commit murder for the promise of remuneration.  Specifically,
appellant asserts that the credibility of both Brown and Lewis—the two key
witnesses regarding a promise of payment for killing Bourgeois—was impeached by
prior inconsistent statements.  Regarding Brown, appellant again points out
that he originally told the Louisiana officer that appellant was the shooter. 
Regarding Lewis, appellant asserts that she contradicted herself in her
testimony, saying at different times that she heard appellant tell Brown that
he would pay Brown to kill Bourgeois and that she did not know anything about a
discussion of money at appellant’s apartment.

The jury again exercised its responsibility to
evaluate the credibility of witnesses and to resolve conflicts in the
evidence.  See id.  Here, the jury could have believed Brown when he
explained that he initially lied to the Louisiana officer because he was scared
and did not trust the officer.  The jury also could have believed Lewis’s unequivocal
testimony on direct examination that she heard a promise of remuneration and
discounted her more jumbled, less-coherent cross-examination testimony
suggesting she did not know anything specifically about the money to be paid. 
Consequently, we find appellant’s arguments without merit and overrule his second
issue.

III.  Corroboration of Accomplice Testimony

In his third issue, appellant contends that there is insufficient
evidence to corroborate the testimony of Brown, Lewis, and Requitta Henry, whom
appellant contends were accomplice witnesses.  Under article 38.14 of the Texas
Code of Criminal Procedure, “[a] conviction
cannot be had upon the testimony of an accomplice unless corroborated by other evidence
tending to connect the defendant with the offense committed; and the
corroboration is not sufficient if it merely shows the commission of the
offense.”  Tex. Code Crim. P. art. 38.14.  In conducting our review under the
article, we disregard all of the accomplice testimony and examine the remaining
record for evidence that “tends to connect the accused with the commission of
the crime.”  Castillo v. State, 221 S.W.3d 689, 691 (Tex. Crim. App.
2007).  The corroborating evidence need not be sufficient to establish guilt
beyond a reasonable doubt or even directly link appellant to the commission of
the crime; it must merely “tend to connect” appellant to the offense.  Id.

For the sake of our
analysis under this issue, we assume that Brown, Lewis, and Henry all were
accomplices.[4] 
Appellant himself provided testimony establishing a motive:  information or
belief that Bourgeois had orchestrated a violent home invasion of appellant’s
apartment.  Rodney Kemper and Morris Crosby also testified that appellant told
them that “Tank” (Bourgeois) was behind the robbery and was “going to get it”
or “was going to get what he deserved.”  Sergeant Robert Spurgeon stated
appellant told him that a man called “Tank,” a known alias for Bourgeois, was
behind the robbery.  Crosby further stated that appellant had repeatedly
inquired as to whether and when Bourgeois would be arriving at the apartment
complex on the day of the murder.  Appellant acknowledged having made threats against
Bourgeois.  He further placed himself at the scene of the crime and admitted
driving the get-away car, taking appellant to a hotel room which had been
rented shortly before the shooting, and providing money for food.

            Even disregarding
the testimony of the alleged accomplices—Brown, Lewis, and Henry—the evidence
tended to connect appellant to Bourgeois’ murder.  Consequently, we overrule
appellant’s third issue.

IV.  Jury Instructions for Other Alleged Accomplices

In his fourth and fifth issues, appellant argues that
the trial court erred in failing to instruct the jury regarding whether Elvira
Lewis and Requitta Henry were accomplice witnesses whose testimony required
corroboration.  Although the charge did include, as discussed above, the
general language pursuant to article 38.14 on corroboration of accomplice
witnesses, neither Lewis nor Henry were identified as accomplice witnesses in
the charge and the jury was not asked to determine whether they were accomplice
witnesses.  See generally Cocke v. State, 201 S.W.3d 744, 747-48 (Tex.
Crim. App. 2006) (“Unless the evidence clearly shows that the witness is an
accomplice as a matter of law, e.g., the witness has been, or could have
been, indicted for the same offense, a question about whether a particular
witness is an accomplice is properly left to the jury with an instruction
defining the term ‘accomplice.’”).

Appellant, however, did not make any request or
objection regarding the absence of accomplice witness instructions for these
witnesses.  Therefore, in order to be entitled to reversal on these issues, he
has to show both that the trial court erred and that egregious harm resulted.  See
Allen v. State, 253 S.W.3d 260, 264 (Tex. Crim. App. 2008).  

The purpose of accomplice
witness instructions is not to cast suspicion on the
testimony provided by such witnesses or to encourage jurors to give less weight
to their testimony; rather, such instructions simply remind the jury, as is
statutorily required, that it cannot use the accomplices’ testimony to convict
the defendant unless there also exists some corroborating evidence tying the
defendant to the offense.  See Cocke, 201 S.W.3d at 747; Herron, 86 S.W.3d at 632.  When
the egregious harm standard applies, the omission of an accomplice
witness instruction is generally
harmless unless the corroborating evidence is deemed so weak and unconvincing
as to render the State’s overall case for conviction clearly and significantly
less persuasive.  Herron, 86 S.W.3d at 632; Saunders v. State, 817 S.W.2d 688, 692 (Tex. Crim.
App. 1991)).  To determine the strength of corroborating evidence,
we examine (1) its reliability and believability, and (2) the degree to which
it tends to connect the defendant to the offense.  Herron, 86 S.W.3d at 632.  If
corroborating evidence is weak and contradicted, and therefore does not have a strong
tendency to connect the defendant to the crime, egregious harm may be present. 
See id. at 632-33 (discussing the facts and outcome of Saunders).

Here, even assuming that there was some evidence
presented suggesting that Henry and Lewis were accomplice witnesses, the
corroborating evidence was such that egregious harm did not result from the
omission of accomplice witness instructions regarding them.  As discussed
above, appellant himself provided testimony
establishing that he had a motive and had voiced threats against Bourgeois, was
present with Brown at the scene of the crime, drove Brown from the scene after
the shooting to a hotel room which had been previously rented, and provided
Brown with money for food.  Furthermore, Kemper and Crosby explained that
appellant had made threats against Bourgeois pertaining to the violent home
invasion of appellant’s apartment, Sergeant Spurgeon said appellant identified
“Tank” as being behind the robbery, and Crosby stated appellant had repeatedly
inquired when Bourgeois would be arriving at the apartment complex on the day
he was killed.  This evidence clearly
connected appellant to the crime, and there is no compelling innocent
explanation for the level of appellant’s involvement with Brown during and
after the shooting.  See id. at 633-34 (analyzing issue under less
burdensome “some harm” standard because error was preserved).

Any error by the trial
court in failing to sua sponte charge the jury on the question of whether Lewis
and Henry were accomplice witnesses did not result in egregious harm. 
Accordingly, we overrule appellant’s fourth and fifth issues.

V.  Corroboration of One Accomplice by Another

            In issue six,
appellant contends that the trial court erred in not instructing the jury that
one accomplice witness’s testimony cannot be corroborated by another accomplice
witness’s testimony.  See Chapman v. State, 470 S.W.2d 656, 660 (Tex.
Crim. App. 1971) (holding that the testimony of accomplice witnesses could not
be used to corroborate each other); Taylor v. State, 7 S.W.3d 732,
743-37 (same).  Here, apparently because both defense counsel and the trial
judge considered Brown to be the only accomplice witness, no such instruction
was requested or given.  Consequently, appellant’s conviction may be reversed
only upon a showing that the trial court erred and such error resulted in
egregious harm to appellant.  See Taylor, 7 S.W.3d at 737.

            In Taylor,
we applied the same type of egregious harm analysis as we employed above concerning
the failure to charge the jury regarding Lewis and Henry as accomplice
witnesses.  See id. (citing Saunders, 817 S.W.2d at 692).  Applying
that same analysis under this issue, we again conclude that even assuming the
trial court erred in failing to instruct the jury that accomplice witnesses
cannot corroborate one another’s testimony for article 38.14 purposes,
appellant did not suffer egregious harm as a result.  As detailed above,
considerable corroborating evidence in this case came from appellant’s own
testimony, as well as that of Crosby and other non-accomplice witnesses. 
Accordingly, we overrule appellant’s sixth issue.

VI.  Ineffective Assistance of Counsel

Lastly, in his seventh issue, appellant contends that
he received ineffective assistance of counsel because his counsel failed to
request instructions that Lewis and Henry were accomplices and that an
accomplice witness’s testimony cannot be corroborated by reference to another
accomplice witness.  The Sixth Amendment to the United States Constitution
guarantees the right to reasonably effective assistance of counsel in criminal
prosecutions.  U.S. Const. amend. VI;
McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970).
In reviewing an ineffective assistance claim, an appellate court “must indulge
a strong presumption that counsel’s conduct [fell] within the wide range of
reasonable professional assistance; that is, [appellant] must overcome the
presumption that, under the circumstances, the challenged action might be
considered sound trial strategy.”  Strickland v. Washington, 466 U.S. 668, 689 (1984).

Under
the two-pronged Strickland test, in order to demonstrate ineffective
assistance of counsel, a defendant must first show that counsel’s performance
was deficient, i.e., that his or her assistance fell below an objective
standard of reasonableness; second, a defendant must affirmatively prove
prejudice by showing a reasonable probability that, but for counsel’s
unprofessional errors, the result of the proceeding would have been different.  Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App.
1999).

Here, even assuming that counsel’s failure to request
certain accomplice witness instructions constituted objectively deficient
performance, appellant has failed to demonstrate that a reasonable probability exists
that but for such deficiency, the outcome would have been different.  As
explained under prior issues, the purpose of accomplice witness instructions is
not to cast suspicion on the testimony of such witnesses or suggest that less
weight should be given to their testimony; the purpose is to remind jurors that
they cannot use the accomplices’ testimony to convict the defendant unless
there also exists some corroborating evidence tending to connect the defendant
to the crime.  See Cocke, 201 S.W.3d at 747; Herron, 86 S.W.3d at 632. 
As also explained in detail above, the corroborating evidence in this case was
particularly strong, establishing that appellant had a motive for wanting
Bourgeois killed, had made threats against him, was present at the time of the
shooting, aided the shooter in fleeing the scene, gave the shooter a place to
stay in the aftermath, and supplied the shooter with money for food.

Given the strength of the corroborating evidence, the
record does not affirmatively establish prejudice by showing a reasonable probability
that the result of the proceeding would have been different had the charge
included the additional accomplice witness instructions.  Accordingly,
appellant has failed to show that even if his counsel’s performance was
deficient, a reasonable probability exists that but for such deficiency, the
outcome would have been different.  See Thompson, 9 S.W.3d at 812.  We
overrule appellant’s seventh issue.

            We affirm the
trial court’s judgment.

                                                                                    

                                                                        /s/        Martha
Hill Jamison

                                                                                    Justice

 

 

 

Panel consists of Justices Frost, Jamison, and McCally.

Do Not Publish — Tex. R. App. P. 47.2(b).









[1]
As will be discussed below, a manager at the motel reported the two bags as
having been left in rooms at the motel.





[2]
It is unclear from Henry’s testimony when or how appellant’s mother got to the
hotel room.





[3]
The jury, as sole judge of the credibility of the witnesses, was free to
believe parts, while disbelieving other parts, of appellant’s testimony.  E.g.,
Dockstader v. State, 233 S.W.3d 98, 102 (Tex. App.—Houston [14th Dist.]
2007, pet. ref’d).





[4]
At the conclusion of trial, defense counsel requested an accomplice witness
instruction pursuant to article 38.14 only for Brown.  In issues four and five,
appellant contends on appeal that the trial court erred in not sua sponte
including accomplice witness instructions concerning Lewis and Henry.  And in
issue seven, appellant contends that he received ineffective assistance of
counsel, in part, because counsel failed to request instructions for Lewis and
Henry as accomplices.