ACCEPTED
13-14-00123-CR
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
6/19/2015 1:55:32 PM
CECILE FOY GSANGER
CLERK

CAUSE NOS. 13-14-00123-CR

IN THE COURT OF APPEALS FOR THE
THIRTEENTH DISTRICT
AT CORPUS CHRISTI, TEXAS

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
6/19/2015 1:55:32 PM
CECILE FOY GSANGER
Clerk

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RAUL LARA, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL OF CAUSE NO. CR-4394-12-E
FROM THE 275TH DISTRICT COURT
OF HIDALGO COUNTY, TEXAS
HONORABLE JUAN PARTIDA, PRESIDING

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BRIEF FOR APPELLANT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Rolando Garza
310 W. University
Edinburg, TX 78539
Bus: (956) 318-1102
Fax: (956) 381-5005

Counsel for Appellant

CAUSE NO. 13-14-00123-CR
IN THE COURT OF APPEALS FOR THE
THIRTEENTH DISTRICT
AT CORPUS CHRISTI, TEXAS

RAUL LARA,                                                          APPELLANT
V.
THE STATE OF TEXAS,                                                 APPELLEE

IDENTITY OF PARTIES AND COUNSEL

The undersigned attorney submits that the listed individuals are parties

and/or counsel to the instant case:

(1)     The Appellant in this case is Raul Lara;

(2)     Appellant is represented on appeal by Rolando Garza, 310 W. University, Edinburg, Texas 78539;

(3)     Appellant was represented in the lower court by O. Rene Flores, 1308 S. 10th Ave., Edinburg, Texas 78539 and Judith Pena-Morales, 120 S. 12th Street, Edinburg, Texas, 78539;

(4)     Appellee is the State of Texas represented by the Hidalgo County District Attorneys office.

(5)     Appellee is represented on appeal by Theodore C. Hake, 100 N. Closner, Edinburg, Texas 78539.

(6)     Appellee was represented in the lower court by Assistant Hidalgo County District Attorneys Bobby Lopez and Heather Reeve, 100 N. Closner, Edinburg,  Texas 78539.

Respectfully Submitted,

/s/Rolando Garza
Rolando Garza

# TABLE OF CONTENTS

INDEX OF AUTHORITIES ...................…………………….…….....................................2

NOTE REGARDING FORM OF CITATION TO RECORD ...........................……......3

STATEMENT OF THE CASE ....................……......………….....................................4

ISSUES PRESENTED ......................................................................................................4

STATEMENT OF FACTS .......................…………………….…….......…….......….5

SUMMARY OF ARGUMENT ......................................................................................14

ISSUE PRESENTED WITH ACCOMPANYING
  ARGUMENT ON SAME PAGE

(1)  The jury charge contains egregious error ...........................................................15

(2)  The trial court reversibly erred in not suppressing the statement;
     however, although requested, findings of fact and conclusions of law
     have not been entered. ....................................................................................24

9.4 CERTIFICATION ...................................................................................................27

CERTIFICATE OF SERVICE ...................................……..............……...................27

# INDEX OF AUTHORITIES

## CASES

*Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App. 1984) .........................................17

*Herron v. State*, 86 S.W.3d 621 (Tex.Crim.App. 2002) ..............................................18

*McIntosh v. State*, 297 S.W.3d 536
(Tex. App.—Houston [1st Dist.] 2009, *pet. ref'd*) .........................................................16

*Herron v. State*, 86 S.W.3d 621 (Tex.Crim.App. 2002) ..............................................18

*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966) ..........................................24

*Missouri v. Seibert*, 542 U.S. 600, 604, 124 S. Ct. 2601 (2004) .................................24

*Ngo v. State*, 175 S.W.3d 738 (Tex.Crim.App. 2005) ..................................................16

*Saunders v. State*, 817 S.W.2d 688 (Tex.Crim.App. 1991) ........................................18

*Smith v. State*, 332 S.W.3d 425 (Tex.Crim.App. 2011) ...........................................16,17

*State v. Owen*, 2014 Tex. App. LEXIS 5680,
(Tex. App. Corpus Christi May 29, 2014) .....................................................................26

*Vasquez v. State*, 411 S.W.3d 918 (Tex. Crim.App. 2013) ........................................26

## NOTE REGARDING FORM OF CITATION TO RECORD

Review of the appellate record indicates that it is composed of a one volume clerk's record and approximately twelve volumes of reporter's record.  In the interest of clarity and brevity, the volumes will be referred to in this brief as follows:

TITLE                                                        DESIGNATION

Clerk's Record .....................…………………......….. "CR"

Reporter's Record......………...…………..........… by date, page numbers

Designations will be preceded by a volume number or date and followed by a page number.

Exhibits will be referred to by exhibit number.

## STATEMENT OF THE CASE

Raul Lara was indicted with one count of murder. (CR-1) Raul was found guilty by a jury as charged in the indictment. (CR-261) On December 19, 2013 the jury sentenced Raul to fifty-five years in the Institutional Division of the Texas Department of Criminal Justice. (CR-262-266)

A timely notice of appeal was filed on January 9, 2014. (CR-279) decision

## ISSUES PRESENTED

(1) The jury charge contains egregious error.

(2) The trial court reversibly erred in not suppressing the statement; however, although requested, findings of fact and conclusions of law have not been entered. The appeal must be abated for findings of fact and conclusions of law.

4

# STATEMENT OF FACTS

Antonio Navarro, testified that he was hanging out at a friends house across the street from where he lived; that there were quite a few people present; that they were outside in a vacant lot; that he heard an argument; that two girls ended up leaving the party; that he was standing by a truck when a van came by and stopped; that the drivers side window was facing him; that the backside door opened; that there was a young gentleman there talking; that his friend "JP" was responding; that JP was asked "Are we cool?"; that JP responded "Yeah, we're cool" and took a step back; that someone then pulled out a gun; that he and others then ran to the front of the truck; that he heard around eight shots; that it was dark and, "You can't really see faces"; that after the van left, he saw "Miguel's car a little bit more down the street stopped"; that Miguel got "caught in the cross fire"; and that he could not identify Raul Lara as the shooter. (12-13-13, pp. 6-21)

Crystal Trevino testified that she was also at the party; that Julissa and Lucinda were told to leave the party in no kind words; that they left walking; that a van then came by that she recognized as the one that would pick up Julissa and Lucinda at school; that she thinks the two are cousins; that someone from the van "opens the side door, and tells the people that are with us that they better not be messing with his cousins"; that she was sitting on the tailgate of the truck even while the shooter

approached with the gun; that the guy who made the comment about the cousins was the same person with the gun and was also holding a rag; that Jamika pushed her out of the way; that she ended up at the front of the truck along with a bunch of other people; and that she could not identify the shooter. (12-13-13, pp. 24-35)

Alvaro Guerra testified that he was at the party; that, as to the shooting, "When I saw him pull out the pistol, I noticed how JP reacted to it. And I see him take a few steps back like going to run. And that's what I heard that the man, the individual, just cocked the gun. And when I heard him cock the gun, he also threw like a sort of like a towel or something over it. And when he did that, that's what I noticed JP run"; and that at no time did he identify Raul Lara as the shooter. (12-11-13, pp. 48-55)

Jamika Duncan testified that she was at the party; that she saw the van pull up; that she thought something was going to happen; that she heard a guy "saying like to leave their cousin alone"; that the first shot went off when she was walking around the truck; that she grabbed her best friend and just turned around; that she did not get a good look at the shooter; and that she was told by her best friend that the shooter also had a rag. (12-13-13, pp. 36-50)

Jamika also testified that she texted Julissa after that night to find out what happened; that Julissa was blaming it on Lucinda, "saying that she was the one mad, that she had told everybody like to go do something"; and that Lucinda was "pissed"

6

because she got kicked out of the party. (12-13-13, pp. 43,48) Jamika also testified that Julissa initially denied being in the van but then admitted that she was. (12-13-13, p. 51)

Andrea Gomez testified that she was at the party; that she was drinking beer and smoking; that everybody was smoking at the party; that she first saw the van drive by real slow and that a male was driving; that the van returned and was driven by Yaritza; that after the van got to the party, "The sliding door was open, and we saw two guys sitting inside the van. And one of the guys had a red rag on his hand. And I automatically knew, like, what it was. And I yelled out that he had a gun so everybody can run"; that two guys were seated in the middle seat; that "JP" was told "I don't want you hanging around with my cousins no more. All right."; that she remembered hearing about seven shots; that a Nick Zapata was rolling marijuana in the car next to a white truck; that the car was facing away from the street; that Nick was facing forward; and that Nick was not a position to see what was in the van or what happened. (12-13-13, pp. 52-65)

Jasmine Villegas testified that she was at the party; that she could not see the faces of the people in the van other than Yaritza, who was driving on the second pass; vacillated as to whether Eric Atwood a/k/a "Negro" was driving the van on the first pass; that Negro was always with Yaritza; that she was sure that Negro was the one who

7

said "Stop messing with my cousins"; that when she heard Negro speak, she saw a gun, in a rag, in his hand; that she recognized his voice since, "They were my ride to school, after school every day"; that she did not see Raul Lara that night; and that the first time she had seen Raul Lara was that day in the courtroom. (12-13-13, pp. 68-86)

Jasmine also recalled a telephone conversation she had with Julissa on speaker phone in which Julissa admitting instructing to shoot but not to shoot at her friends. (12-13-13, pp. 87-88)

Investigator Ileana Pena testified that she initially had arrest warrants for Yaritza Tijerina and her husband Eric Atwood a/k/a "El Negro"; that surveillance was conducted on the Tijerina residence/ranch; that the Tijerina family consisted of Yaritza, Lucinda, Julissa, and Eric Atwood; that when the investigators arrived at the ranch, Eric Atwood had fled; that Jasmine, who was at the party and knew Eric Atwood, identified him as the shooter; that Lucinda led her to believe that Jorge Caballero/George was the shooter; that in her affidavit, Lucinda did not mention Raul Lara; and that Raul Lara was never identified in a photo line-up. (12-12-13, pp. 126-136)

Investigator Eduardo Ruiz testified that he took a statement from partygoer Nicholas Zapata and that he could neither provide a name for the shooter nor could he give a good description of the shooter. (12-12-13, pp. 187-188)

Nicholas Zapata said that he was at the party; that he was smoking marijuana; that the girls that came to the party brought the marijuana; that a van pulled up; that they got off and started talking to JP; that he was sitting in a car with his leg halfway out; that he was looking back; that he could see towards the van but not inside the van; that he did not recognize anyone from the van; that he saw one person get out of the van and start shooting; that "As soon as I saw the gun, I just ducked down"; that he later saw police reports with pictures of people who had been arrested; and claimed that he then recognized Raul Lara as the shooter. (12-13-13, pp. 92-105)

Nicolas then testified that when he first spoke to the police, he did not give much of a description of the shooter since he was in shock and high from smoking weed; that all he told the police was that the shooter had a goatee and white cap; that it was dark; that when the shooting started, he had already smoked weed; that he was in the car listening to music; then claimed that when the van pulled up, "I turned around and stepped out"; that "You can't give a description of a face"; that "I recognized his face as soon as I saw it on the news"; that "when they arrested him, they asked me if that was him. And I said yes"; that he saw Raul Lara on the news and in the newspaper; that he knew that Raul had been fingered as the shooter; agreed that somebody needed to pay for this shooting; and that he was never shown a photo line-up with Raul Lara in it. (12-13-13, pp. 106-126)

9

Rogelio Torres testified that he was smoking marijuana before the van arrived; that he did not recognize the van; that someone started saying something to JP; that when he heard the gun being cocked, he ran to the back of the truck; that from the van he heard one voice; that the shooter had a white shirt, cap, goatee, and tattoos on his arms; that "It was dark. I couldn't see his face. Technically, I couldn't see his face"; that he was never given a photo line-up to look at; that he was shown pictures in the future; that the police told him who was the shooter; and responded in the affirmative when asked "You were told this person is the shooter? Is this him?". (12-13-13, pp. 133-152) Rogelio was not asked to do an in court identification of Raul Lara as being the shooter. (12-13-13, pp. 133-153)

Christian Zapata said that the deceased was his brother-in-law; that a guy came out of the van and started arguing with JP to "stop chilling with his cousin"; that he had not seen him before; that he was wearing a black cap, with a white tee, and blue jeans; that he had a white towel wrapped around a gun; that when the shooting started he ran to the back of his mom's house; that the shooter was skinny, in his 20's, with a goatee and tattoos; that as to the middle seat of the van, he could only see shadows; that he was not shown Raul Lara in a photo line-up; that he saw news reports; that he did not remember if he saw the shooter in the first reports; that a police officer showed him a newspaper with Raul Lara's picture in it; that the police told him which people had been

10

arrested; that he then recognized Raul Lara as the shooter; that the same person who was holding the towel would be the same person who had the gun; and that Raul "looks like" the same guy that came out of the van. (12-13-13, pp. 153-170) He was also not asked to make an in court identification of Raul Lara as being the shooter.

Ivan Lopez testified that the deceased was his best friend; that he did not get a good look at the shooter; that "it was too dark for me really to point him out specifically"; that the shooter had a short face, short hair, dark complected/caramel like, and "like a goatee"; and that he could not identify Raul Lara as the shooter even though he was in the deceased's vehicle with the head lights on. (12-13-13, pp. 173-186)

Martin Zapata testified that only one person came out of the van; that he did not know who it was; eventually admitted that when he first spoke with the police that the only description he gave of the shooter was that he wearing a white T-shirt and blue jeans; that after seeing news reports, he added to his description of the shooter as being in his 20's, a black cap, tattoos on his arm, and a goatee; that after seeing news reports, he recognized Raul Lara as the shooter; that Edinburg Police Department "showed us pictures. But they weren't the line-up. And it wasn't them. So I identified him on the newspaper. They had a picture of him"; and that today, he added that the shooter was skinny and young. (12-13-13, pp. 188-205)

11

Juan Pablo Sosa, Jr., said that he was also know as "JP"; that he was smoking marijuana on the night in question; that he was the closest person to van; that the back door slid open; that "the one that's in front of us, he told us not - - to stop chilling with his cousins"; that there was another voice coming from the van; that someone handed the shooter a weapon; that the weapon is wrapped in a white towel; that he couldn't really see the weapon; that he took a couple of steps back and ran towards the front of the truck; that he heard shots; that he did not look back; that he had not seen the shooter before; that he later saw news coverage of Raul Lara being arrested; that he recognized him in the newspaper; that he had no reason as to why he waited three weeks to go tell the police; that on the night of the shooting he told the police that the shooter had a little mustache; that there was a difference between a mustache and a goatee; and that smoking marijuana has no affect on him. (12-13-13, pp. 214-240)

Investigator Arnoldo Izquierdo testified that in his report he noted that JP Sosa was shown two photo line-ups, one of Little Bear, Leonardo Moreno, and of Raul Lara; that JP Sosa was unable to identify anyone from the line-ups; and that today he was saying that Raul Lara was not in the line-ups. (12-12-13, pp. 244-245)

Stevie Ray Aguilar testified that he was as at the "get together"; that a van passed by and then returned; that one of the individuals in the van said "something that do not be messing with my prima"; that he heard "the individual, just cocked the gun. And

12

when I heard him cock the gun, he also threw like a sort of like little towel or something over it"; that they were under a couple of lamps so there was good lighting conditions and could see pretty good; that people scattered; that the shooting began; and that at no time had he identified Raul Lara as the shooter. (12-11-13, pp. 38-55)

Officer Joseph Anthony Lucio testified that he responded to a call for shots fired in the present case; that he did field interviews; that there was no one at the location that named Raul Lara as the shooter; and that no one gave him a description of the shooter. (12-11-13, pp. 67-76)

Investigator David Valdez testified that he recovered a towel from the suspect vehicle/van; that he found it between the second and third row seats; and that he submitted the towel for testing. (12-11-13, pp. 176-179)

Doctor Vanessa Nelson, the section supervisor for the DNA analysis section for the Texas Department of Public Safety Crime Lab in Weslaco, testified that a towel from the present matter was submitted to her for DNA analysis; that the DNA found on the towel was compared to known saliva samples from Raul Lara, Jr., Leonardo Moreno, Eric Atwood, and Martin Tijerina, Jr.; and she was able to exclude Raul Lara, Jr., Leonardo Moreno, and Martin Tijerina, Jr.; and that the DNA on the towel came back to "Eric Atwood, and a mixture of somebody else. But as far as Lara, Moreno and Tijerina, it is not their DNA on there." (12-12-13, pp. 37-50)

13

SUMMARY OF ARGUMENT

The jury charge contains egregious error since the jury was instructed to pass over the issue of whether two key witnesses were accomplices as a matter of fact when they were accomplices as a matter of law.

The trial court reversibly erred in not suppressing Raul statements since it was obtained in violation of Criminal Procedure Article 38.22, *Miranda v. Arizona*, *Missouri vs. Seibert*, the Fifth Amendment to the United States Constitution, and was obtained in violation of constitutional rights to have a knowingly, intelligently and voluntary statement. At the trial level defense counsel requested findings of fact and conclusions of law; however, no such entry is in the clerks record. In this circumstance, the appeal must be abated for findings of fact and conclusions of law for meaningful briefing.

## FIRST ISSUE PRESENTED

The jury charge contains egregious error.

## ARGUMENT AND AUTHORITIES IN SUPPORT OF
## THE FIRST ISSUE PRESENTED

The jury was instructed as follows:

Upon the law of accomplice witness testimony, you are instructed that a person who has participated with someone else before, during or after the commission of a crime is an accomplice witness. In such cases, there must be some evidence of an affirmative act on the witness' part to assist in commission of the offense. If the witness cannot be prosecuted for the offense with which the accused is charged, then the witness is not an accomplice witness as a matter of law. A witness is not an accomplice witness merely because he or she knew of the offense and did not disclose it, or even concealed it. The witness's presence at the scene of the crime does not render that witness an accomplice witness.

Now, if you find from the evidence that Lucinda Tijerina was an accomplice, then you are further instructed that you cannot convict the Defendant upon Lucinda Tijerina's testimony, unless you first believe that her testimony is true and shows the guilt of the Defendant as charged in the indictment, and then you cannot convict the Defendant unless Lucinda Tijerina's testimony is corroborated by other evidence tending to connect the Defendant with the offense charged.

Now if you find from the evidence that Julissa Tijerina was an accomplice, then you are further instructed that you cannot convict the Defendant upon Julissa Tijerina's testimony, unless you first believe that her testimony is true and shows the guilt of the Defendant as charged in the indictment, and then you cannot convict the Defendant unless Julissa Tijerina's testimony is corroborated by other evidence tending to connect the Defendant with the offense charged.

15

The corroboration of an accomplice witnesses' testimony is not sufficient if it merely shows the commission of an offense, but it must tend to connect the Defendant with its commission, and then from all the evidence, you must believe beyond a reasonable doubt that the Defendant is guilty of the offense charged against him, or if you have a reasonable doubt thereof, you will acquit the defendant.

You are further instructed that one or more accomplices cannot corroborate each other. Such corroborative evidence, if any, must be from some source other than said accomplices, Lucinda Tijerina and Julissa Tijerina, or either of them, as herein charged.

(CR-254-256)

The jury was instructed to determine if Lucinda and/or Julissa were accomplices as a matter of fact versus being instructed that both or either were an accomplice as a matter of law.

The Legislature has determined that the factfinder should exercise caution when considering the testimony of an accomplice; "accomplices often have incentives to lie, such as to avoid punishment or shift blame to another person." *Smith v. State*, 332 S.W.3d 425, 439 (Tex.Crim.App. 2011).

A trial court must instruct a jury by "a written charge distinctly setting forth the law applicable to the case." Tex. Code Crim. Proc. Ann. art. 36.14; *see McIntosh v. State*, 297 S.W.3d 536, 542 (Tex. App.—Houston [1st Dist.] 2009, *pet. ref'd*). In analyzing a jury charge issue, it is first determined whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005). If error is found, an appellate court will

16

then analyze the error for harm. *Id*. The degree of harm necessary for reversal depends on whether the defendant preserved the error by objection. *Id*. Reversal is required for a jury charge error when the defendant has properly objected to the charge and an appellate court finds "some harm" to his rights. *Id*. (*citing Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)). When the defendant fails to object, or states that he has no objection to a charge, an appellate court will not reverse for charge error unless the record shows "egregious harm" to the defendant. *Id*. at 743-44. Thus, charge error is reviewed by considering whether (1) error exists in the charge and (2) if so, whether sufficient harm resulted from the error to require reversal. *Id*. at 744.

An accomplice is a person who participates before, during, or after the commission of an offense, with the requisite culpable mental state. *Smith v. State*, 332 S.W.3d 425, 439 (Tex.Crim.App. 2011). Presence at a crime scene alone does not make a person an accomplice; rather, an accomplice must have engaged in an affirmative act that promotes the commission of the offense that the accused committed. *Id*. A witness may be considered an accomplice as a matter of fact or as a matter of law. *Id*. If the evidence is conflicting as to whether a witness is an accomplice, then the trial court may instruct the jury to determine the witness's status as a fact issue. *Id*. at 439-40. When the evidence clearly shows that a witness is an accomplice as a matter of law, however, the court must instruct the jury accordingly. *Id*. at 439.

17

"A witness who is indicted for the same offense or a lesser-included offense as the accused is an accomplice as a matter of law." *Id.* If the State dismisses the indictment before the witness testifies, the witness is no longer deemed to be an accomplice as a matter of law. *Id.* "A witness continues to be regarded as an accomplice, however, if the witness agrees to testify against the accused in exchange for the dismissal of the charge." *Id.*

"[T]he omission of an accomplice witness instruction is generally harmless unless corroborating (non-accomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Herron v. State*, 86 S.W.3d 621, 632 (Tex.Crim.App. 2002) (*quoting Saunders v. State*, 817 S.W.2d 688, 689 (Tex.Crim.App. 1991)).

As noted previously, Jasmine testified about a telephone conversation she had with Julissa in which Julissa admitting instructing to shoot. (12-13-13, pp. 87-88) Julissa Tijerina was represented by attorney Rubio Salinas. (12-16-13, p. 7)

Prior to testifying, the State put on the record that Julissa was offered immunity in exchange for her testimony "regarding the murder that happened October 5, 2012, and her alleged involvement in that murder and any other involvement that she may have had in the aftermath of the murder related to that murder." (12-16-13, p. 25-26)

Regarding the shooting, Julissa said that when the van stopped, Leonardo a/k/a/ Little Bear opened the sliding door; that Leonardo told the people at the party to "not hang out with us"; that Raul did not tell the people anything; that "Raul just sticks one leg out and starts shooting"; that Leonardo then "sticks out a gun and starts shooting"; that she heard ten or eleven shots; that they close the door to the van and leave fast; that Raul said the shooting was fun and looked happy; that Raul said he had two bullets left; that Raul and Leonardo picked up the bullet casings that were in the van; that Yaritza told her to tell the police that the shooter was someone named George; that she did not do so; that she was arrested and taken into custody for these charges; and that she was offered immunity in the present murder. (12-16-13, p. 100-112)

During a hearing in the present matter, the State noted a list of co-defendants to include Eric Atwood, Lucinda Tijerina, Leonardo Moreno, and Martin Tijerina. (12-16-13, p. 12) Lucinda Tijerina was represented by attorney Abiel Flores. (12-16-13, p. 8) During cross-examination, Lucinda testified that both she and her cousin Julissa had been arrested on murder charges. (12-16-13, p. 79)

Lucinda testified that Yaritza Tijerina was her sister; that Martin Tijerina was her brother; that Yaritza was married to Eric Atwood a/k/a "Negro"; that Julissa Tijerina was her cousin; that she knew Leonardo Moreno a/k/a "Little Bear" for about four years; and that she knew Raul Laura since she was little. (12-16-13, pp. 36-39)

19

Lucinda further testified that on the night in question, she was smoking weed at her friend's Andreas house; that everyone there was smoking weed; that she had previously took two Xanax pills at school; that she went to party along with the girls that were at Andreas house; that she did not have permission to go to the party; that there were twenty to thirty people at the party; that they were outside in a lot; that she was drinking, smoking, and taking pills at the party; that the guys told her to leave the party because she was a minor; that she was unable to find a ride from someone at the party; that she began walking; that her sister picked her and Julissa up at a stop sign in a van driven by Eric; that Yaritza was in the front passenger seat; that Raul and "Little Bear" were in the middle seat; that Raul was behind Eric; that Little Bear was behind Yaritza; that Martin was in the backseat; that she went to sit by the window in the very back seat; that instead of heading home, they went by the party; that they made a U-turn; that everybody remained in their seats; and that they then stopped at the party. (12-16-13, pp. 39-56)

Lucinda then said that Raul opened the door; that Little Bear started "telling them like not to hang around with us no more"; that Raul said something similar; that Raul and Little Bear started shooting at the same time from inside the van; that she saw two guns; that they both had guns; that she saw about twenty people running; that she heard about eight or nine shots; that they drove off; that Raul was telling Little Bear that he

20

hadn't done that in long time; that they went to her mothers house; that Raul, Little Bear, Negro, and her sister started searching the van; that Yaritza told her to tell the police that the shooter was someone named George; that she did tell the police that George was the shooter; and that in exchange for her testimony, the State had agreed not to prosecute her for anything she may have done in connection with this murder. (12-16-13, pp. 55-70)

Juveniles Lucinda and Julissa were implicated in instigating the retaliatory shooting. (12-13-13, pp. 43,48) (12-13-13, pp. 87-88) They were both susceptible to prosecution. Both Lucinda and Julissa were charged and arrested with the present murder. Subsequently, both were granted immunity in exchange for their testimony. They were accomplices as a matter of law. The jury should have been charged accordingly. Instead, the jury was instructed to determine whether Lucinda and Julissa were accomplices as a matter of fact.

The omission of the correct accomplice instruction was extremely harmful and amounted to egregious error/ the non-accomplice evidence was so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive. *Saunders v. State*, 817 S.W.2d 688, 689 (Tex. Crim. App. 1991).

First, the accomplice issue was heavily contested. In closing argument, the State stressed Lucinda's and Julissa's testimony to fill in the gaps and further stressed that

21

they were not accomplices. The State argued that the State did not have to prove that the bullet came from Moreno's gun or Lara's gun because Lucinda said both were shooting (12-17-13, pp. 28-29); that there was no affirmative act taken by Lucinda or Julissa (12-17-13, p. 32); that Julissa was unwavering as to her version of events, unlike other witnesses (12-17-13, pp. 101); and that "The only people that have any protection in the van were Lucinda and Julissa. And they told you who the shooters were" (12-17-13, pp. 104-15).

The defense strongly stressed to the contrary by making such arguments that blood was thicker than water/that Lucinda and Julissa were shielding their relatives by claiming non-relatives were the shooters (12-17-13, pp. 51); that the State wanted the jury to ignore the accomplice witness instruction (12-17-13, pp. 28-29); stressed the principle that the jury could not convict on accomplice witness testimony, "unless you first believe that here testimony is true, and shows his guilt as charged in the indictment. And then you can cannot convict him unless her testimony is corroborated by other evidence tending to connect him with the offense. That's a lot of hurdles to get through. And the reason they want you to ignore it because they want you to believe what they say without questioning" (12-17-13, pp. 64).

The jury requested to view the statements of Julissa Tijerina and Lucinda Tijerina to all of the questions asked by the defense attorneys. (12-18-13, pp. 8-11)

22

Julissa and Lucinda's testimony was the cornerstone of the State's case. Without that testimony, the State was left with such scenarios as having one versus two shooters; having DNA on a towel, found in the suspect van and allegedly used in the shooting, come back to one shooter, Eric Atwood a/k/a "El Negro" who was related to Julissa and Lucinda; having someone familiar with Eric Atwood identifying him as the shooter; having people identify Raul as the shooter from overly suggestive news reports versus a photo line up; having a possibly missing photo line up which contained Raul's photo but that no one identified; having people who gave vague descriptions of the shooter now adding to their descriptions after having seen overly suggestive news coverage; having statements from Raul that he was not the shooter; having a case where the voluntariness of Raul's statements was an issue for the jury to decide (CR-253); a case where the police told Raul to make a statement or go down for murder; and a case where the shooter told people to not be messing with his cousins Julissa and Lucinda; to whom, Raul is not related.

The non-accomplice evidence was so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive. Also by allowing Julissa and/or Lucinda to be found to be mere fact witnesses, the jury was allowed to convict on either of their testimony alone.

A new trial is needed.

23

## SECOND ISSUE PRESENTED

The trial court reversibly erred in not suppressing the statements; however, although requested, findings of fact and conclusions of law have not been entered.

## ARGUMENT AND AUTHORITIES IN SUPPORT OF
## THE SECOND ISSUE PRESENTED

In the present matter, a suppression hearing was had in which the trial court heard evidence. (12-6-13, Investigators Ileana Pena and Orlando Garcia testify)

After the presentation of evidence/testimony, defense counsel challenged the admissibility of Raul's statements as being obtained in violation of Texas Code of Criminal Procedure Article 38.22; being obtained in violation of *Miranda*; being obtained in violation of constitutional rights to have a knowingly, intelligently and voluntary waiver of rights; being obtained in violation of *Missouri vs. Seibert*; the product of Raul being told to simply sign waivers instead of being given a choice; the product of Raul being coerced by such threats that if he did not talk that he was going down for the murder; obtained in violation of the Fifth Amendment to the United States Constitution; that the waivers were not signed by witnesses; and the overall voluntariness of the statements. (12-6-13, pp. 81-107) Defense counsel also requested that the court consider all of the statutory and constitutional provisions cited in the Motion to Suppress. (12-6-13, pp. 98)

24

The trial court asked the State if it had to enter findings; to which, the State answered in the affirmative. (12-6-13, pp. 97) The trial court stated it would consider everything that was presented that morning. (12-6-13, pp. 81-97)

Defense counsel also filed a Memorandum in Support of Defendant Lara's Motion to Suppress Statement of Accused. (CR-223-232)

The trial court subsequently denied suppression of the statements noting it had reviewed the evidence, the arguments, and filings of counsel. (12-9-15, pp. 5-6) Defense counsel then requested findings of fact and conclusions of law for purposes of the appellate record. (12-9-15, p. 7)

During the course of trial, defense counsel objected to the introductions of Raul's statements. (12-12-13, pp. 110-112, objections to statement/States Exhibit 84 were overruled ) (12-12-13, pp. 210, objections to statement/States Exhibit 86 overruled)

Raul's initial statement noted that he did not remember anything about the shooting. (12-12-13, pp. 113-114) In the second statement, Raul places himself in the van and says that he was the one that opened the door to the van; that "Little Bear" began getting rowdy with the people at the party; that Little Bear then pulls out a gun from his waist and begins shooting; that he then closed the door to the van; that Little Bear was "pretty barred out"; and that "when they got to my house they started looking for bullets inside the van". (12-12-13, pp. 210-216)

The State stressed Raul's statements to the jury making such arguments as that even according to Raul, "they" looked through the van to pick up bullet casings (12-12-13, pp. 27-28); that not even Raul says Atwood a/k/a "Negro" was the shooter (12-12-13, pp. 31-32); that "Mr. Lara's own statement puts him in the car" (12-12-13, p. 33); and went into a lengthy narrative preceded by: "I want to talk to you about what we know from the Defendant's own words", to demonstrate guilt (12-12-13, pp. 38-40).

In the present matter, defense counsel requested findings of fact and conclusions of law at the trial level. Review of the clerks record does not show the entry of findings of fact and conclusions of law.

At this time, appellate requests an abatement for the entry of findings of fact and conclusions of law and then the opportunity to meaningfully brief the issue of suppression therefrom. *See Vasquez v. State*, 411 S.W.3d 918, 920 (Tex. Crim.App. 2013) (appellate court must abate appeal for findings of fact when appellant challenges voluntariness of statement, even when findings not requested in trial court); *State v. Owen*, 2014 Tex. App. LEXIS 5680, *7 (Tex. App. Corpus Christi May 29, 2014) (this Court abated the appeal and ordered the trial court to issue findings of fact and conclusions of law, the trial court filed its findings of fact and conclusions of law, the State filed an amended brief in response to the trial court's findings and conclusions).

## PRAYER

Wherefore, premises considered, Appellant, prays for an abatement for findings of fact and conclusions of law and that the conviction and sentence be reversed.

Respectfully Submitted,

/s/Rolando Garza
Rolando Garza
310 W. University
Edinburg, TX 78539
Bus: (956) 318-1102
Fax: (956) 381-5005
SBN: 24004665

## 9.4 Certification

In compliance with Texas Rule of Appellate Procedure 9.4(i)(3), I certify that the number of words in this brief, excluding those matters listed in 9.4(2)(B) is approximately 5,710 words.

/s/Rolando Garza
Rolando Garza

## CERTIFICATE OF SERVICE

I, Rolando Garza, certify that I have mailed or hand delivered a copy of the foregoing brief to Theodore C. Hake, 100 N. Closner, Edinburg, Texas 78539, and to Raul Lara, # 01904469, Stiles Unit, 3060 FM 3514, Beaumont, TX 77705 on June 19, 2015.

/s/Rolando Garza
Rolando Garza